ALFRED S. SHARPE, administrator,[1] vs. PETER PAN
BUS LINES, INC., & another.[2]

Suffolk.    November 5, 1987. — March 9, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Negligence,* Bus terminal, Carrier, Foreseeability of harm. *Carrier,* Passengers.

In a negligence case, sufficient evidence supported a jury's finding that the
operator of a bus terminal was a "common carrier." [791-792]

In a negligence action brought against a bus company and the owner of a bus
terminal by the representative of a patron of the bus service who had
been stabbed to death in an unprovoked attack in the terminal while
waiting there for a bus, the defendants' motions for directed verdicts
were correctly denied where the evidence warranted a finding that each
defendant failed to fulfil its high duty of care as a common carrier with
respect to patrons' security, that the stabbing of the victim was within
the reasonably foreseeable risks created by each defendant's breach of
duty, and that the assailant probably would have been deterred from
attacking the plaintiff's decedent if a security guard had been present
in the terminal at the time. [792-794] LYNCH, J., dissenting, with whom
NOLAN and O'CONNOR, JJ., joined.

CIVIL ACTION commenced in the Superior Court Department
on July 30, 1981.

The case was tried before *George N. Hurd, Jr.,* J.

*Thomas D. Burns (Michael Weinberg* with him) for the
defendants.

*John E. Lecomte (Mario Misci* with him) for the plaintiff.

WILKINS, J. On Sunday morning, February 22, 1981, Sharon
Lee Glynn, a sixteen year old who had purchased a bus ticket
to go home after visiting a friend in Westfield, was waiting
in the Springfield bus terminal to board a Peter Pan bus. Without
warning and without provocation, one Patrick Werner, a stran-

---

[1] Of the estate of Sharon Lee Glynn.

[2] Springfield Bus Terminal Corporation.

ger to Sharon, walked up behind her while she was talking with two young friends seated with her in the terminal, and stabbed her three times in the back, killing her. The circumstances of the crime and Werner's appeal from his conviction of murder in the second degree appear in *Commonwealth v. Werner,* 16 Mass. App. Ct. 686 (1983).[3]

In this action the jury found by a special verdict that each defendant was negligent and that its negligence was a proximate cause of Sharon's death. They awarded damages for wrongful death and for conscious suffering. We transferred the appeal of the defendant bus company (Peter Pan) and the defendant bus terminal (Springfield) to this court. We affirm the judgment.

The defendants contend that the judge erred in denying their motions for directed verdicts. Peter Pan argues that it owed no duty at all to Sharon when she was sitting in the terminal and that, in any event, at the time of the attack, it did not owe her the high duty of care owed by a common carrier. Peter Pan did not raise by its motion for a directed verdict the point that it had no duty to Sharon at the time she was attacked. Nor did Peter Pan make the argument orally in support of its motion. We do not, therefore, have to pass on the claim that Peter Pan owed Sharon no duty whatever. In any event, the belated argument lacks merit.[4]

---

[3] A copy of the Appeals Court opinion was admitted in evidence without objection. Werner argued unsuccessfully on appeal that the evidence required a finding of not guilty because it showed that he lacked criminal responsibility under the standard set forth in *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967).

[4] Our cases have long extended passenger status, and thus have imposed a duty of care on a common carrier, to people on its premises for the purposes of transportation. See *MacSwan* v. *Metropolitan ·Transit Auth.,* 340 Mass. 499, 500-501 (1960) (one who had traveled on train and was leaving station was still a passenger); *Gray* v. *Boston & Me. R.R.,* 168 Mass. 20, 24 (1897) (one who entered station to travel on train was a passenger); *Warren* v. *Fitchburg R.R.,* 8 Allen 227, 231-232 (1864) (one who had purchased ticket and was waiting in station was a passenger).

The fact that Springfield operated the terminal does not exonerate Peter Pan. A carrier owes a duty to a passenger waiting in a station which the carrier is using voluntarily, even if the station is operated by another company. See *Kuhlen* v. *Boston & N. St. Ry.,* 193 Mass. 341, 350 (1907). Cf.

The record does not show that Peter Pan at any time raised the question of the standard of care to which it was to be held. Peter Pan made no request for instructions concerning the level of its duty of care (that is, the standard against which the question of its negligence would be tested), nor did Peter Pan object to the judge's charge, which placed a higher duty of care on Peter Pan as a common carrier than that ordinarily placed on a landowner with respect to a business visitor. Before us the argument is expressed only in terms of an error in the denial of Peter Pan's motion for a directed verdict. Because Peter Pan did not contest at trial that it was held to the high standard of a common carrier, we shall assess the evidence on that standard in deciding Peter Pan's challenge to the denial of its motion for a directed verdict.[5]

---

*Hunt* v. *New York, N.H., & H. R.R.*, 212 Mass. 102, 105 (1912)); *Frazier* v. *New York, N.H. & H.R.R.*, 180 Mass. 427, 429, 430 (1902). In the *Hunt* and *Frazier* cases, the general rule was held to be inapplicable to claims of persons injured in the South Station in Boston because by statute the defendant was obliged to use that station, which was operated by another corporation. Peter Pan's use of the Springfield bus terminal was voluntary. Peter Pan had a voice in the management of Springfield. The chairman of Peter Pan's board of directors was president of Springfield.

[5] The evidence might also meet the test ordinarily applied to a landowner. If it did, for directed verdict purposes, the question of the standard to which Peter Pan should be held would become irrelevant. See *Silver* v. *New York Cent. R.R.*, 329 Mass. 14, 17 (1952).

Peter Pan's concession at trial that the stricter level of care applied to it makes consideration of that question unnecessary. The concession seems to have been correct under the law of the Commonwealth. In this century, our cases have not applied a standard of the utmost care and diligence, or the highest degree of care consistent with proper management of the business, as to claims based on the alleged negligent maintenance of a carrier's premises, such as in slip and fall cases. See *Reardon* v. *Boston Elevated Ry.*, 311 Mass. 228, 229 (1942) (duty to keep premises in a reasonably safe condition); *Connolly* v. *Boston Elevated Ry.*, 309 Mass. 177, 179 (1941) (same); *Klein* v. *Boston Elevated Ry.*, 293 Mass. 238, 240 (1936) (reasonably safe and suitable condition); *Ward* v. *Boston Terminal Co.*, 286 Mass. 517, 518 (1934) (terminal company held to duty of exercising ordinary care toward invitee who slipped and fell). Contrast *Jordan* v. *New York, N.H., & H. R.R.*, 165 Mass. 346, 347 (1896) (carrier owed passenger highest degree of care, consistent with proper management of business, to maintain premises in safe condition). In cases involving injuries caused by assaults or by the violence of other passengers, however, our cases have held

Springfield argues that in operating a bus terminal it was not subject to the higher duty of care of a common carrier. Its argument here is that because it is not a common carrier, it is only subject to the ordinary duty of care of a landowner and that the evidence against it presented no question for the jury. In arguing its motion for a directed verdict, Springfield did not raise in writing, or discuss orally, the level of care to which it was to be held. Its only objection to the judge's charge on Springfield's duty of care was to the judge's decision to leave to the jury the question whether on the facts Springfield was a common carrier. Without objection, the judge told the jury that, if Springfield was a common carrier, it should be held to the same standard of care as Peter Pan.[6] Springfield did not request an instruction that it was held to the ordinary duty of care of a landowner or that its duty of care should be distinguished from that of Peter Pan. We conclude that the jury could have found that Springfield, which performs services for common carriers, was a common carrier. Cf. *McCabe* v. *Boston Terminal Co.*, 303 Mass. 450, 453-454 (1979) (terminal company is common carrier for Federal Employers' Liability

---

the carrier to a high degree of care. See *Quigley* v. *Wilson Line of Mass., Inc.*, 338 Mass. 125, 128 (1958) (assault by fellow passenger) ("common carrier owes to its passengers the highest degree of care in the anticipation and prevention of violence from its employees, other passengers, and even strangers, as is consistent with the nature and operation of its business); *Holton* v. *Boston Elevated Ry.*, 303 Mass. 242, 244 (1939) (pushed by intoxicated passenger); *Isenberg* v. *New York, N.H. & H. R.R.*, 221 Mass. 182, 183-184 (1915) (battery by one passenger on another); *Glennen* v. *Boston Elevated Ry.*, 207 Mass. 497, 498-499 (1911) (jostling crowd). This principle was most recently applied in *Magaw* v. *Massachusetts Bay Transp. Auth.*, 21 Mass. App. Ct. 129, 131 (1985) (robbery in underpass at subway station). Of course, even when the test of utmost care and diligence applies, there is always the question of what is reasonable in the circumstances. See *Dodge* v. *Boston & Bangor S.S. Co.*, 148 Mass. 207, 219 (1889). See also *Rich* v. *Boston Elevated Ry.*, 316 Mass. 615, 618-619 (1944); *Glennen* v. *Boston Elevated Ry.*, *supra* at 498.

[6] Peter Pan stipulated that it was a common carrier. Springfield would not so stipulate. The status of Springfield was a question of fact for the jury. The judge rightly put to the jury alternative standards of care to be applied depending on whether or not they found that Springfield was a common carrier, that is, whether its business was "principally concerned with or necessarily connected to the transportation of passengers for hire."

Act purposes). Springfield thus properly could be held to the same standard of care as Peter Pan, a standard the defendants accepted as being the high duty of care of a common carrier.[7]

We turn then to the issue whether the evidence presented a case for the jury. Our inquiry first concerns the question whether either defendant failed to act reasonably in the circumstances to provide the utmost care and diligence to protect patrons of the terminal. The second issue, by far the harder question of the two to answer, is whether any breach of duty may have been a reasonably foreseeable cause of the attack on Sharon.

We have little hesitancy in ruling that the evidence warranted a finding that each defendant failed to fulfil its high duty of care concerning security in the terminal. The jury would have been warranted in finding that the terminal was in a rundown section of the city. Homeless people and drunks frequented the area. The terminal was in an active area for crimes against the person, one characterized by a Springfield police captain as an area of high criminal activity. There had been robberies in the terminal's restrooms and assaults in the terminal. Evidence concerning the neighborhood of a bus terminal and the people who frequent it is relevant to a case of this type. See *Wesley* v. *Greyhound Lines, Inc.*, 47 N.C. App. 680, 685 (1980). The terminal management called the police every week because of a security or other problem. The terminal had no uniformed security person working for it. The defendants were aware of a need to have security present in some form but had no security plan. Because of security problems, the management of the terminal had asked the local police to make periodic patrols. Sunday morning was a time of substantial activity in the terminal; as many as fifteen buses would arrive at or leave the terminal each hour.

---

[7] During a colloquy at the bench on the second day of trial the judge stated his view that a carrier has "a rather high standard of duty to protect those who use its facilities." Although put on notice of this view, the defendants never took steps to preserve the judge's conclusion for appellate consideration. In fact, the defendants appear to have accepted that principle of law as applicable to them if they were common carriers.

There was evidence warranting a finding that the stabbing of Sharon was within the reasonably foreseeable risks created by each defendant's breach of duty. The jury could have reasonably found that the defendants were negligent in failing to provide a uniformed security force in the terminal. It is likely that a uniformed security officer in the terminal could not have prevented Werner's attack on Sharon. The fact that a physical attack could not have been prevented, once a person had decided to undertake it, however, does not fully answer the causation question.

The presence of uniformed police or security personnel provides a deterrent effect. Lay people would have a sense that this is true. In this case, an expert on security procedures testified that uniformed police or security officers are the best deterrent to crime that one could have and that a security officer could have been placed effectively in the terminal. The jury could reasonably have concluded that as a deterrent to crime the defendants had a duty to provide uniformed security personnel in the terminal at the time of the attack.

The question, of course, is not simply whether crime in general might have been deterred by a police presence, but whether the jury would have been warranted in finding that it was more probable than not that sudden, unprovoked attacks, such as Werner's attack on Sharon, could have been prevented. See *Mullins* v. *Pine Manor College,* 389 Mass. 47, 58 (1983). The jury could have found that Werner was concerned about not being caught. He fled the scene, hid the knife, tried to elude the police, and was found hiding in the vicinity. See *Commonwealth* v. *Werner,* 16 Mass. App. Ct. 686, 687-688 (1983). The evidence warranted a finding that Werner probably would have been deterred from attacking Sharon if a uniformed security guard had been present. The plaintiff's expert answered responsively to a question on cross-examination that, if a uniformed security guard had been there, the attack prob-

ably could have been prevented. On the evidence, it was within the jury's province to reach the same conclusion, as they did.[8]

*Judgment affirmed.*

LYNCH, J. (dissenting, with whom Nolan and O'Connor, JJ., join). The court today concludes that a causal connection exists between the unprovoked and inexplicable criminal act of a third person and the failure of the defendants to provide a *uniformed* security force inside the bus terminal where the attack occurred (emphasis mine). In order for liability to exist in these circumstances, as the court concedes, there must be a basis for a finding that the act causing the plaintiff's injuries was within the reasonably foreseeable risks created by the defendant's breach of duty. "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct should have realized the likelihood that such a situation might be created thereby

---

[8] We do not discuss objections to the judge's charge on causation and foreseeability not raised at trial.

The judge told the jury to consider whether the defendants could have guarded against the act of violence committed in the terminal. He also instructed them that, if they found that a defendant negligently failed to provide adequate security, they would be warranted in finding that a defendant's negligence was the proximate cause of Sharon's injury if proper security would have been designed to prevent harm of the same general character as that which occurred to Sharon. These instructions adequately put to the jury the question whether the harm which occurred was within the risk created by any defendant's negligent failure to provide security. These instructions thus covered the reasonable aspects of the defendants' concern that the judge instruct that the plaintiff must prove that the attack was preventable. If the attack was not preventable, even if there had been a reasonable security presence at the terminal, then the harm to Sharon was not within the risk created by any negligent failure to provide security, or, as the judge put it, there would be no liability if the proper security would not have been designed to prevent harm of the character that occurred to Sharon.

and that a third person might avail himself of the opportunity to commit such a tort or crime." *Bellows* v. *Worcester Storage Co.,* 297 Mass. 188, 196-197 (1937), quoting from Restatement of Torts § 448 (1934). See *Mullins* v. *Pine Manor College,* 389 Mass. 47, 54-56 (1983); *Magaw* v. *Massachusetts Bay Transp. Auth.,* 21 Mass. App. Ct. 129, 133-135 (1985); Restatement (Second) of Torts § 448 (1965). The import of the above authorities is that, before a defendant will be held to answer for injuries sustained as a result of a third party's criminal acts, even when the defendant's conduct created the opportunity for the commission of the crime, there must be a showing that the defendant was put on notice as to the potential occurrence of such injurious criminal activity.[1] That condition was not satisfied here. Neither is there any connection between the defendant's negligence and the plaintiff's harm.

The evidence as to notice consisted of two police reports. One involved complaints in 1977 of "winos" and derelicts sleeping in the station overnight and assaulting the employees when they were awakened between 5 and 5:30 A.M. The other involves a single individual, also a "wino," who in 1978, was bothering people.[2] These incidents do not provide notice to the defendants that a deranged killer might enter its premises at 9:30 on a Sunday morning and, in the midst of a crowd of people, repeatedly stab a fellow passenger.

---

[1] In *Mullins* v. *Pine Manor College, supra,* we rejected the rule, in effect in some jurisdictions, that the plaintiff must introduce some evidence of prior criminal acts before liability may attach. However, we have never said that liability may be imposed without any showing that defendant could have foreseen the harm. In *Mullins,* the college's own precautions against rapes on campus were taken as evidence that the college had notice. *Id.* at 55. Furthermore, this portion of the holding in *Mullins* was expressly limited to "the circumstances before us." *Id.*

[2] The plaintiff also introduced the testimony of a Springfield police officer that he considered the area around the bus station to be an "active" one regarding assaults and larcenies; he gave only a general recollection of what he thought of the area. He produced no records of any murder ever having occurred previously at the bus station. In any event, this evidence is not relevant in the circumstances of this case, where the killer was an apparently nonthreatening fellow traveler from out-of-State rather than an undesirable denizen of the bus station's allegedly unsavory surroundings.

The defendants were on notice that winos frequented the bus station overnight and in the early morning. The defendant responded by engaging two employees — each of whom was designated either a special or an auxiliary police officer for the city of Springfield — to watch over the terminal and deal with any vagrants there. As far as the record discloses, these employees were adequate to resolve security problems with which the defendant theretofore had been confronted.[3] In other words, once put on notice of a problem with vagrants, the defendants responded with appropriate measures. There is no indication in the record of circumstances that would have given notice to the defendants of the likely occurrence of a bizarre attack by one passenger upon another.

Moreover, the negligent act of failing to provide *uniformed* security personnel did not create the opportunity for the criminal act inflicted upon the plaintiff's decedent. See Restatement (Second) of Torts § 448 (1965). The attack on Sharon occurred in broad daylight in a terminal full of people. Sharon sat with two friends, one of whom was a two-hundred-pound, six-foot tall young man. In such circumstances, the presence or absence of a uniformed security guard could have had little effect on whether the attack would or would not have occurred. One could speculate over a such a question. Perhaps a security guard would have intervened successfully in the attack, or perhaps he would have been at the other end of the waiting room. Possibly a uniformed security guard would have deterred the killer from entering the station. In all likelihood, since the killer was an ordinary traveler on his way through Massachusetts from Colorado, the presence of a security guard would have had no effect at all. The jury are entitled to draw reasonable inferences from the evidence. They are not entitled to base a verdict on conjecture. The question whether the defendants' failure to employ a uniformed guard was the proximate cause of Sharon's death may be resolved only through the exercise of conjecture. Therefore, it is a question not properly for the jury. See *Northern Ry.* v. *Page,* 274 U.S. 65, 72-73 (1927).

---

[3] If they could not deal with a problem themselves, they called the Springfield police.

The conclusion that proximate cause exists involves the application of a legal standard to a particular set of facts. If either the facts or the reasonable foreseeability of the intervening criminal act are subject to reasonable difference of opinion, the question of proximate cause must go to the jury. Restatement (Second) of Torts § 453, comment b (1965). See W. Prosser & W. Keeton, Torts § 45 (5th ed. 1984). Here, however, the essential facts concerning Werner's act are undisputed and there can be no question that, on the evidence before them, the jury could not conclude that Werner's inexplicable and unprovoked attack was reasonably foreseeable by the defendant.

In the case of proximate cause, "[t]here is a decided tendency to leave every question to the bewildered jury, under some vague instruction which provides no effective guide." W. Prosser & W. Keeton, Torts, *supra* at 319. This tendency cloaks the determination in the veil of a finding of fact. See *id.* at 274. It thereby inappropriately allows an appellate court to evade its duty to explicate the law — and the policy reasons behind the law — of proximate cause. Recent events reveal that the passenger bus trade does not enjoy the robust health and competition of some other areas of American commerce. See 53 Antitrust & Trade Regulation Report 87 (BNA, July 16, 1987) (merger of Greyhound and Trailways bus companies after failure of Trailways). See also *In re Carey Transp., Inc.,* 50 B.R. 203 (Bkrtcy. 1985) (bankrupt bus company). For some, the bus is the only affordable method of travel. There exists a current tendency by some to find liability in every case, even in the absence of fault or where, as here, the fault of the defendants is unconnected to the acts which caused the plaintiff's decedent's injuries. This trend is justified on the theory of society's interest in diffusing the costs of a plaintiff's injuries. But, as we should all know by now, there is no free lunch. Here, the increased cost of insuring against such unforeseeable incidents will be borne by those who can least afford it — the bus-riding public. And when these costs are added to the price of a bus ticket, the result will be that a greater segment of working class Americans can no longer afford

the most economical means of long distance travel and that fewer bus companies will offer service to fewer locations. In the name of egalitarianism, disenfranchisement is created. I, therefore, dissent.