Toomey, J.
INTRODUCTION
This suit arises out of an altercation, on or about May 25, 1991, between plaintiff, Charles B. Tuite (Tuite), and defendant, Michael Naples (Naples). Tuite and Naples were celebrants at an ill-fated bachelor party which ended in fisticuffs. In Count I of his complaint, Tuite seeks to recover for personal injuries caused by Naples whom Tuite asserts assaulted and battered him. In Count II, Tuite seeks to recover from Weagle Bus Company, Inc. (Weagle) for the same injuries, asserting that Weagle was negligent in permitting the members of the party to become excessively intoxicated and in failing to intervene to prevent the fist fight which erupted at the end of the evening.
Weagle now moves for summary judgment, claiming that it is not liable because Tuite’s injuries were caused after the party alighted from its bus and, therefore, Weagle owed no duty to Tuite at the time he was injured. All parties submitted memoranda and a hearing on the motion was held on December 16, 1993.
For the reasons set forth below, Weagle’s motion for summary judgment will be ALLOWED.
BACKGROUND
The uncontested facts, garnered from deposition testimony submitted by the parties, are as follows. On or about May 25, 1991, Tuite, Nagle, and twelve or thirteen other men gathered at G. Willickers, a bar in Shrewsbury, to attend a bachelor party. At approximately 7:00 p.m., after drinking at G. Willickers for about an hour, the men boarded a bus, owned by Weagle; the bus had been engaged to transport them for the evening. Weagle’s employee or agent, Joseph Cardaro (Cardaro), was the driver of the bus. The men brought beer onto the bus when they boarded.[2]
Cardaro drove for approximately one hour to the Saugus area and the parly alighted at an establishment called the Officer’s Club. The bus ride to Saugus was characterized somewhat differently by the parties. Tuite testified that there were no altercations *285 and the men were not rowdy. Naples testified that the men were rowdy and were “yelling, screaming, jumping around.” It is undisputed that there were no physical altercations during this leg of the journey.
Cardaro testified that, at 11:00 p.m. when he returned to pick up the pariy, local police were present and told Cardaro to “(g]et them on the bus and get them out of here." Cardaro further testified that on the return trip to G. Willickers, the men were “raising heck.” Naples testified that the men were singing and yelling and that they were wrestling, but there were no fist fights. Tuite testified that there were several fights on the return trip and that he was struck by another member of the party, Eric Gosslein. Yet another member of the party, P.J. Cassanelli, testified that there were fights throughout the return trip, but no one was injured.[3]
Upon returning to G. Willickers, the men alighted and Tuite was the last to disembark from the bus. Cardaro testified that after the members of the party alighted in the G. Willickers parking lot, they “went cra2y” and began fighting. Cardaro was aware of the fighting, but left the parking lot and returned to Weagle. Tuite alleges that he was struck by Naples and sustained serious personal injuries in an altercation in the parking lot.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact in dispute and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). “Acomplete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) (citing Celotex v. Catrett, 477 U.S. 317, 322 (1986)). At bar,'there is indeed a fatal failure of an essential element of Tuite’s case against Weagle.
A. Nature and Scope of Carrier’s Duty in this Case
“A common carrier of passengers is required to exercise the utmost care consistent with the nature and extent of its business to carry its passengers to their destination in security and enable them to alight there with safety.” Glennen v. Boston Elevated Railway, 207 Mass. 497, 498 (1911). “[A] common carrier owes to its passengers the highest degree of care in the anticipation and prevention of violence from its employees, other passengers, and even strangers, as is consistent with the nature and operation of its business.” Quigley v. Wilson Line of Massachusetts, Inc., 338 Mass. 125,128 (1958). A common carrier has a duty to its passengers to anticipate reasonably foreseeable injury and to take steps to avert reasonably preventable injury. Id. at 129. A common carrier, however, is not a guarantor of the absolute safety of all its passengers and is not responsible for “manifestations of lawlessness, heedlessness, impetuosity or force” that the carrier could not reasonably be expected to forestall. Glennen, 207 Mass, at 498-99; see Quigley, 338 Mass, at 128 (carrier not obliged to foresee and prevent unlikely dangers and improbable harms).
In the present case, it is undisputed that Weagle was a common carrier and, therefore, owed a duty of utmost care to the members of the party. The question presented by this case is the scope of that duty; this court is called upon to locate the outer boundaries of Weagle’s duty as a common carrier. The reach of Weagle’s duty will be determined with reference to the particular facts at bar and in the context of the legal rationale underlying the imposition of an elevated standard of care upon common carriers.
Historically, the law has imposed a stringent duty on common carriers because passengers have little control over the operation or conduct of their transport and have an extremely limited ability to secure their own safety; passengers must rely on the carrier’s care. Holton v. Boston Elevated Railway, 303 Mass. 242, 244 (1939). Thus, in recognition of the passenger’s vulnerability, the Supreme Judicial Court has held carriers responsible for injuries sustained by passengers where the victims were assaulted by other passengers who were excessively intoxicated. Quigley, 338 Mass, at 129; Holton, 303 Mass, at 247.
The defendant in Quigley operated a ferry on which alcoholic beverages were served from a cash bar on the lower deck. Quigley, 338 Mass, at 126. The defendant had hired police officers to be present during the cruise. Id. Two passengers became intoxicated at the bar and the bartender refused to serve them. Id. at 127. After the men became involved in a physical confrontation with another passenger, the police officers forcibly removed them from the bar and left the men unattended on the upper deck. Id. at 127-28. Thereafter, as the plaintiff and his companions entered the upper deck area, the two men assaulted the plaintiff. Id. at 128. The court held that disorder and injury to innocent parties were foreseeable consequences of the carrier’s leaving the intoxicated men unguarded. Id. at 130.
Similarly, in Holton, the court held a common carrier liable for injuries caused by an intoxicated passenger. That case involved a street car driver who permitted an intoxicated passenger to board and then watched the man stumble down the aisle of the car, swearing in a loud voice, and settle into a seat behind *286 the plaintiff. Holton, 303 Mass, at 243. When the car arrived at the terminal and the plaintiff stood and prepared to disembark, she was pushed by the intoxicated man several times. She requested that he stop, but the passenger shoved the plaintiff again, causing her to be thrown from the car onto the platform. Id. The court noted that the injury was preceded by a series of events that occurred within the vision and hearing of the operator, who permitted them to continue, and the court concluded that this was not an unexpected act, but one that could reasonably have been anticipated by the carrier. Id. at 247. The court acknowledged that merely permitting an intoxicated person to board would not give rise to liability because alcohol affects persons differently and it can be difficult to judge levels of intoxication. Id. at 246. While the driver might not have been justified in denying the man entry, the court stated that a jury could have concluded that the driver was obliged to monitor the passenger’s actions more closely. Id. at 246-47.
Naples argues that Quigley and Holton control the instant controversy. The facts of the case at bar, however, are fundamentally different from the referenced cases. The parties in both Quigley and Holton were riding on public transportation and were assaulted by strangers. Common carriers are held to a higher duty of care because passengers place their safety in the hands of the carrier. In the unique setting of public transportation, the obligation includes not only the provision of security from road hazards, but also the responsibility to address those personal safely concerns that arise when a large number of strangers are placed together in closed quarters.
In contrast, Weagle was not engaged by fifteen strangers acting separately, but by a party of fifteen acquaintances. And further, Weagle was not merely to deliver its passengers to a site where they would go their separate ways, but was to transport them, as a homogeneous unit, for an evening of prenuptial revelry at which convivial immoderation was the shared objective of the merry-makers. These facts shape the scope of Weagle’s duly and the care it was bound to exercise. Cf. Holton, 303 Mass, at 244 (common carrier “bound to exercise reasonable care according to the nature of its contract with” passenger); Glennen, 207 Mass, at 498 (common carrier owes duty of “utmost care consistent with the nature and extent of its business”). Thus, Weagle owed a duty of utmost care with respect to monitoring and negotiating road hazards that might cause harm to its passengers,[4] but was not obliged to monitor and intervene in the interactions of the members of the group to the same degree or extent as would be required of, for example, an MBTA driver with respect to unacquainted passengers on his or her bus.
This is not to say that Weagle owed absolutely no duty to monitor its passenger’s activities. There is certainly some point at which Weagle owed a duty to the passengers, as individuals, to protect them from threats to their safety at the hands of other passengers. Had Tuite been injured during the bus trip, this case would probably present a jury question as to whether, even though Cardaro’s duty would not require him to intervene as quickly as would be required of the driver of an MBTA bus, Cardaro was negligent in failing to intervene at some point during the bus ride. But, those are not the facts at bar. Even accepting a view of facts most favorable to Tuite — to wit, the macho posturing on the return trip was not merely good-natured wrestling, but rose to the level of full-fledged fighting, and the several fisticuffs were visible and audible to the driver — plaintiff cannot recover because his injuries were caused after the termination of the carrier-passenger relationship.
In sum, this court concludes that the law imposes a lofty standard of care upon a common carrier, but the very loftiness of that standard requires that the court define with extreme caution the parameters within which the elevated standard is to operate. At bar, and for the reasons stated infra, the injury to Tuite occurred outside those parameters and he can, accordingly draw no comfort from the elevated standard.
B. Weagle’s Common Carrier Duty Terminated when the Party Disembarked
Even if the bacchanalia on the bus had risen to such a level that Weagle was obliged to intervene to secure the safety of its passengers, the facts at bar suggest that Weagle has no liability because no one was injured on the bus as a result of Weagle’s failure to intervene. The duty of a common carrier is to transport passengers safely to their destination and to allow them to disembark safely. Glennen, 207 Mass, at 498. Once the passengers are permitted safely to alight, however, their relation to the carrier is fundamentally altered, and the common carrier is not responsible, by virtue of its status as a carrier, for extra-vehicle conditions that may cause injury. Bettencourt v. Massachusetts Bay Transportation Authority, 1 Mass.App.Ct. 847, 848 (1973). Thus, a common carrier was not liable for a plaintiffs injuries where a passenger stepped off a bus and was injured due to a defect in a public way. Id. This limitation of liability is consistent with the rationale underlying the enhanced duty of common carriers, to wit, by entering the carrier’s confines, a passenger surrenders much of her ability to preserve her own safety, but once a passenger steps out of the vehicle she once again regains the ability to protect herself from dangerous conditions.
Tuite and Naples point out that appellate courts have held common carriers liable for injuries to passengers that occur outside of the particular form of transportation the carriers provide. The courts indeed have held that a common carrier was liable to persons present on certain premises for the purposes connected with transportation, where the carrier either *287 controlled or voluntarily used the premises. Magaw v. Massachusetts Bay Transportation Authority, 21 Mass.App.Ct. 129, 131-33 (1985) (common carrier liable to a plaintiff assaulted in unlighted pedestrian tunnel controlled by MBTA): Sharpe v. Peter Pan Bus Lines, Inc., 401 Mass. 788, 790 (1988) (common carrier liable to a plaintiff who was stabbed, while waiting in terminal used by carrier, where carrier was negligent in failing to provide security personnel). A common carrier has also been held liable for failing to warn passengers of the dangerous condition of a roadway that was under construction where the carrier knew passengers crossed the way to continue their journey in elevated cars on the other side of the way. McManus v. Boston Elevated Railway, 262 Mass. 519, 520-22 (1928).
Those factual situations are not, however, present in the case at bar. It is undisputed that the members of the party had terminated their trip when they disembarked at G. Willickers. Furthermore, Weagle did not own the parking lot, nor did it voluntarily use the lot on a regular basis as a terminál. G. Willickers was merely the location designated to pick up and drop off the members of the party. Weagle’s duty as a common carrier, therefore, ceased when Cardaro arrived at G. Willickers and the men alighted from the bus in apparent safety.
There may be a circumstance where the court would recognize liability of a common carrier where foreseeable consequences of a carrier’s tortious act occur after a passenger alights from.the carrier’s vehicle. For instance, if a passenger were exposed to toxic fumes while riding on a bus and, after disembarking, the passenger were overcome by the effects of the exposure, this might present a jury question as to the carrier’s liability. Thus, if, after alighting, the passenger lost consciousness as a result of the toxic exposure and was injured when he or she was struck by an automobile, the carrier might be liable notwithstanding the fact that the injuries were sustained after the carrier-passenger relationship had terminated. Such liability would, of course, rest on the circumstance that the injuries were the foreseeable consequence of a tortious act by the carrier — viz, exposing passengers to toxic fumes — which occurred during the course of the carrier-passenger relationship.
The facts of the instant case, however, do not fall within that construct. In the present case, the carrier did not commit a tortious act during the course of the carrier-passenger relationship. As discussed in Section C infra, Weagle’s failure to put a stop to the drinking on the bus is not actionable. Any injuries that resulted after the carrier-passenger relationship terminated did not flow from a tort which occurred during the carrier-passenger relationship and, therefore, Weagle cannot be liable for Tuite’s post-relationship injuries.
C. Weagle is not Liable for Permitting the Party to Become Intoxicated and Rowdy
Tuite argues that Weagle’s duty continued after disembarkation because Weagle caused or allowed a dangerous condition to be created by failing to stop the consumption of alcohol or to intervene in the fighting on the bus. Tuite concludes that the injury which occurred in the parking lot was a foreseeable risk of that failure to act.
Given the circumstances in this case and the relationship between the members of the party and Weagle, the driver was not negligent in failing to intervene in the fighting where no one requested him to intervene, nor was anyone injured. Moreover, there is no reason to believe that if Cardaro had intervened to break up the fighting, this would have prevented the fighting from erupting again once the men were in the parking lot. Compare Sharpe, 401 Mass, at 793 (presence of uniformed security officers at terminal might have had effect of deterring crime rate, thus averting stabbing of passenger).
Furthermore, Weagle is not liable for permitting the members of the party to continue drinking beer which they had brought on the bus. To hold Weagle liable in such circumstances would essentially be to impose social host liability where the court has declared that there is no liability.[5] A commercial vendor of alcoholic beverages may be held liable for failing to subdue or monitor an intoxicated patron where the vendor is aware of boisterous or threatening behavior of the patron and where the intoxicated person subsequently injures a third party. Carey v. New Yorker of Worcester, 355 Mass. 450, 452-53 (1969); McFadden v. Bancroft Hotel Corp., 313 Mass. 56, 59-60 (1943); see also McGuiggan v. New England Telephone & Telegraph Co., 398 Mass. 152, 157 (1986) (commercial vendor liable for serving intoxicated patron who injured third parties while driving a motor vehicle). The court, however, has consistently refused to impose liability on hosts where guests become intoxicated from alcohol that the guésts themselves supplied. Cremins v. Clancy, 415 Mass. 289, 294 (1993) (no liability for permitting minor to become intoxicated from liquor he provided); Ulwick v. DeChristopher, 411 Mass. 401, 406 (1991) (host not liable where guests became intoxicated at a “bring your own booze” party). The court has stated that control of the alcoholic beverages should be the dominant factor in determining whether to impose liability, because a host who provides alcoholic beverages to guests has the ability to refuse to serve an intoxicated guest. Ulwick, 411 Mass, at 406. The only alternative available to a host who does not provide the alcoholic beverages may be to eject the guest, thus placing the intoxicated person behind the wheel and creating the very risk to third parties that is sought to be avoided. Id.
Similarly, imposing a duty on a bus driver under the facts presented in the case at bar would create *288 impractical and undesirable results. As a practical matter, Cardaro did not have control over the beer the men brought on the bus any more than Cardaro had control over how much they drank at the Officer’s Club. Weagle’s primary duty to its passengers was to transport them safely to the point of origin. If the men refused to stop drinking, Cardaro’s only alternative would have been to eject them from the bus, abandoning them en route to Shrewsbury. This may well have violated Weagle’s primary duty as a common carrier and may have rendered the ejected passengers vulnerable to serious harm. The purpose of engaging a bus company for a party such as this is to avoid having any member of the party drive while intoxicated. To impose a duty to supervise and monitor the parly’s activities to such an extent that the duty follows the party members’ activities after their journey ends would make it impractical for a company to provide such services. Cf. Holton, 303 Mass, at 244 (common carrier held to “highest degree of care compatible with the practical performance of all its duties in accordance with the demands of the public as to accommodations, convenience, comfort, rapidity and expense”).
This court, therefore, concludes that Weagle breached no duty to its passengers during the course of the passenger-carrier relationship. Accordingly, Weagle will not be held liable for injuries which occurred after the passenger-carrier relationship terminated. Summary judgment shall issue in Weagle’s favor.
ORDER
It is, therefore, ORDERED that defendant, Weagle Bus Company Inc.’s Motion for Summary Judgment is hereby ALLOWED. Judgment shall enter in the favor of Weagle Bus Company, Inc.

No evidence was properly presented to the court as to the quantity of beer the party brought on board the bus.

The men did not bring any additional alcohol onto the bus for the return trip. One deposition excerpt appears to indicate that they were drinking beer left over from the initial trip, but no evidence was presented to the court as to the extent of any drinking during the return trip.

Had the fighting interfered with the driver’s ability safely to operate the bus, causing injury to the passengers, Weagle would likely be liable for breaching this duly of utmost care.

While neither party has raised the issue of social host liability, this court nevertheless deems that the issue of such liability is important to the resolution of this case.