Fabricant, J.
INTRODUCTION
This case originated as a personal injury claim brought by Donald Dennis against Consolidated Rail Corporation (Conrail), arising from an incident in which Dennis was,struck by a Conrail train at the Framingham commuter rail station. Conrail joined the MBTA, which operates the station. Dennis settled with Conrail for $270,000, and with the MBTA for $10,000. Conrail and the MBTA then pursued indemnification claims against each other, based on provisions of their “Trackage Rights Agreement.” These claims came on for trial before this Court on October 6, 1998.
At the outset of the trial, the parties presented motions raising issues of interpretation of the relevant provisions of the agreement between them. Further, it was apparent at the outset that the issue of whether the MBTA had any duty, either to Conrail or to Dennis, depended not on any disputed issue of fact, but solely on questions of law, including both interpretation of contractual provisions and application of common law principles regarding the duties of an operator of property. Accordingly, the Court reserved the legal issue of duty, along with all issues of contract interpretation, for after trial. Trial proceeded, before a jury, on the factual issues of negligence and causation.[1] On October 13, 1998, the jury returned a verdict on special questions, finding negligence and causation on the part of both parties, and allocating responsibility 70% to the MBTA and 30% to Conrail. The jury also found that Dermis was “intentionally present, walking, or standing on railroad property at the time of his injury,” and that neither Conrail nor the MBTA committed wilful, wanton or reckless conduct.
Presently before the Court are the MBTA’s motion for judgment notwithstanding the verdict, and Conrail’s motion for judgment. Each party takes the position that it is entitled to judgment in its favor on all pending claims, with the result that the other is required to indemnify it for its payment to Dennis and for its costs and attorneys fees in this litigation. For reasons that will be explained, the Court concludes that judgment must enter for the MBTA on all counts.
1. Conrail’s Claims.
Conrail’s claims against the MBTA rest on two alternative theories. First, Conrail contends that the MBTA had a contractual duty to it, under Section 5.03(d) of the Trackage Rights Agreement, to provide police protection at the Framingham station. Conrail contends that Dennis’s injuiy, and hence Conrail’s payment to him, resulted from the MBTA’s failure to fulfill this duly, so that Conrail is entitled to recover from the MBTA its payment to Dennis as consequential damages for the MBTA’s breach of contract. Second, Conrail contends that the MBTA had a common law duty to Dennis to provide reasonable security at the station, and that the MBTA’s breach of that duty was a proximate cause of the accident, giving Conrail indemnification rights under Section 7.07 of the agreement.
Section 5.03 of the agreement governs “CONRAIL Rail Properties.” Paragraph (d) of Section 5.03 provides:
MBTA shall operate, including provision of police protection, maintain and make any improvements or alterations it may determine to be necessary or appropriate on all passenger stations, platforms, overhead pedestrian bridges and other solely passenger facilities, at its sole expense.
Conrail’s position is that this provision requires the MBTA to provide police protection[2] at passenger stations on Conrail property. The MBTA, relying on the phrase “it may determine to be necessary or appropriate," argues that the paragraph (d) imposes no duty at *351 all, merely giving it the right to operate such stations as it chooses, in whatever manner it chooses, at its sole discretion and expense. Conrail counters that the phrase “it may determine to be necessary or appropriate” modifies only “improvements or alterations,” not “operate, including provision of police protection.” Thus, it reads the paragraph as requiring the MBTA to operate stations, and reads “provision of police protection” as part of the requirement to “operate.”[3]
As between these two conflicting interpretations, the Court is inclined to view the latter as more consistent with the language and apparent purpose of the paragraph. The use of “shall” indicates that the paragraph is meant to impose duties, not merely to grant authority. Further, it is a matter of common sense that operation of a station will render some degree of police protection not just advisable, but necessary, just as operation of a station will render some maintenance functions essential. On the other hand, alterations and improvements are generally discretionary with the operator of the premises. The paragraph thus appears designed to insure that, to the extent that the MBTA’s choice to operate stations on Conrail property renders certain functions necessary, the MBTA will take responsibility for performing those functions. It follows that any liability arising from the failure to perform necessary functions at such a station would fall to the MBTA, and not to Conrail.
The Court need not adopt a definitive interpretation of this provision, however. It is clear in the agreement, and the parties agree, that Section 5.03 applies only to “CONRAIL rail properties.” It is undisputed that the Framingham commuter rail station, including the platform, adjacent parking areas, and most importantly, the tracks adjacent to the platform, where the injury occurred, are not on Conrail property, but are on property leased by the MBTA from a private landowner. Thus, paragraph 5.03(d) of the agreement has no application, and gives rise to no contractual duty on the part of MBTA that has any bearing on this case.
Conrail’s alternative theory of duty rests on cases involving a property owner’s duty to provide reasonable security. E.g. Griffiths v. Campbell, 425 Mass. 31, 34 (1997); Whittaker v. Saraceno, 418 Mass. 196, 197 (1994); Sharpe v. Peter Pan Bus Lines, Inc., 401 Mass. 788, 789-93 (1988); Mullins v. Pine Manor Coll., 389 Mass. 47, 54 (1983). These cases recognize a common law duty on the part of operators of certain types of businesses and institutions to provide reasonable security to protect their patrons from foreseeable risks of injury from the criminal or negligent conduct of third parties.
The weakness in Conrail’s theory is that there is no evidence in this case, and indeed no contention, that the injury arose from the conduct of any third party. The evidence presented at trial was that Dennis was in the area of the station, alone,[4] for the purpose of crossing the tracks, so as to take a short-cut to his home from a friend’s home where he had been visiting.[5] As he walked toward the station, he fell on a spur leading from the tracks to a Conrail freight yard,[6] injuring himself apparently severely enough to cause some degree of disorientation.[7] Some time after his fall (perhaps only a minute or two, or perhaps as much as twenty minutes, depending on whether one accepts as precise his estimate of the time he left his friend’s house), he made his way to the platform, and then onto the tracks, into the path of the train.[8] Nothing in the evidence suggests, and Conrail does not contend, that any third party pushed Dennis onto the tracks, caused him to fall on the spur, or played any other role in the event.
Conrail’s theoiy of common law liability would thus require recognition of a duty on the part of the MBTA to protect Dennis not only from conduct of third parties, but also from his own negligent or criminal conduct, or even from his own nonnegligent accident. Conrail provides no citation to any authority recognizing such a duty, and the Court is aware of none. Accordingly, the Court concludes that the undisputed facts establish the absence of any duty of care of the MBTA toward Dennis.
It may be worth adding that, even if a duty existed, the Court would grant the MBTA’s motion for judgment notwithstanding the verdict, because no reasonable view of the evidence supports the jury’s findings of negligence and causation on the part of the MBTA. See e.g., Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992); O’Shaughnessy v. Besse, 7 Mass.App.Ct. 727, 729 (1979).
Conrail presented no evidence of any standard for the provision of police protection, against which the MBTA’s conduct could be measured. It offered no expert testimony. Compare Sharpe v. Peter Pan Bus Lines, 401 Mass. 788, 793 (1988) (security expert testified as to deterrent effect of uniformed officers); cf. Polonsky v. Union Hospital, 11 Mass.App.Ct. 622, 624 (1981) (expert opinion required to show standard of care in medical malpractice case). It relied instead on portions of a manual of the MBTA police department, which it interprets as establishing a standard requiring assignment of an officer to the station full-time, along with testimony that no MBTA police officers had been seen at the station at various times.[9] The manual provides no support to the MBTA’s position, for two distinct reasons. First, it expressly indicates, in unequivocal language, that it applies only to the MBTA’s rapid transit system, not to the commuter rail system. Second, the particular provisions of the manual on which Conrail relies, by their plain terms, do not require the assignment of a full-time officer to any particular station; they merely identify criteria to be considered in deciding which stations warrant such assignment. The MBTA’s police captain confirmed both aspects of this interpretation in his testimony. See e.g. Northbridge v. Natick, 394 Mass. 70, 74 (1985) *352 (agency’s construction of its own regulation is entitled to deference). In assigning its police personnel, the MBTA’s management must consider such criteria with reference to any particular station in comparison to other stations, so as to rationalize the overall allocation of resources. Conrail offered no evidence that would have provided a basis for the jury to second guess the MBTA police captain’s testimony that, relative to other stations in the MBTA system, neither usage nor criminal activity at the Framingham station warranted assignment of a full-time police officer.[10]
In this respect this case differs significantly from Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153 (1983). There, the parties had entered into an agreement for a fireworks display to be conducted on a particular date in a location to be provided by the town; the town agreed to “furnish necessaiy police, fire, and sponsors protection, for proper crowd control, auto parking . . . and proper supervision in clearing the area of debris after the display.” Id. at 154. The contract itself thus established a standard by specifying with precision the function for which police protection was to be provided, in the context of an obviously hazardous activity. Despite the contract, “no police had been detailed to stay with the truck [containing the explosive devices] either during or after the display,” and the “police and fire departments provided [the display operator] with no protection” as he attempted simultaneously both to guard the truck and to recover unexploded devices. His efforts were less than fully effective, and a teenager was injured by a display remnant left at the scene. Id. at 154-55. The Court upheld a judgment of liability against the town for negligence in fulfilling its contractual duty. That decision lends no support to Conrail’s position here, where the evidence shows no comparably specific undertaking by the MBTA.
The jury’s verdict on causation is similarly flawed. At trial, Conrail argued that the presence of a uniformed police officer, or the knowledge by persons who frequented the area that such an officer might be expected, would have deterred Dennis from attempting to cross the tracks outside of the designated area. The Supreme Judicial Court has recognized the general effect of the presence of uniformed police or security personnel in deterring criminal conduct. See Sharpe v. Peter Pan Bus Lines, 401 Mass. at 793. The question here, however, is whether a reasonable jury could find, on the evidence presented, that any negligence in the provision of security would have deterred the particular conduct by Dennis that led to his injury. See id. at 793. It is clear on the evidence that regular patrols by a uniformed officer of the Framingham Police Department in a marked cruiser in fact occurred, and did not deter Dennis’s conduct. The evidence offered nothing whatever to suggest any difference between the Framingham Police and the MBTA police that would have made the latter more effective in this regard. The evidence further establishes that the sight and sound[11] of the oncoming train also failed to deter Dennis. On these facts, it is pure speculation to conclude that even an officer stationed full time on the platform would have had the deterrent effect that the train itself did not.
Conrail’s alternative argument at trial was that an officer could have helped Dennis after his fall, so that he would not have been on the platform in a state of disorientation. Aside from the apparent inconsistency between this theory of causation and the jury’s finding that Dennis was intentionally on the tracks at the time of the injury, the evidence provides no basis for a finding that the fall, and resulting disorientation, was foreseeable, so that the MBTA could be expected to seek to prevent it.
2. The MBTA’s Claims.
The MBTA claims a right to indemnification from Conrail under Section 7.07(a) of the Trackage Rights Agreement, which provides as follows:
CONRAIL shall defend, indemnify, and save harmless MBTA and MBTA Employees from any and all liability, damage, or expense of any kind whatsoever, including reasonable attorneys fees, arising out of injury to or death of any Person, or arising out of loss of, damage to or destruction of any property of any Person, resulting from the negligence or fault of CONRAIL, CONRAIL Employees or other contractors of CONRAIL (Other than MBTA).
The jury found, after trial, that Conrail was negligent, and that its negligence was a proximate cause of Dennis’s injury. Those findings are supported by the evidence. The jury also found that Dennis was intentionally on the tracks, and that Conrail’s conduct was not willful, wanton, or reckless. These findings, which were also supported by the evidence, establish that Conrail was not liable for Dennis’s injury. See Jad v. Boston & Maine Co., 26 Mass.App.Ct. 564, 566 (1988) (railroad not liable to trespasser absent wilful, wanton or reckless conduct). The indemnification provision, however, applies not only when Conrail has liability, but whenever its negligence causes the MBTA to incur “liability, damage or expense of any kind whatsoever, including reasonable attorneys fees.” Here, Conrail’s negligence caused the MBTA to incur not only the cost of its settlement with Dennis, but also the expense of defending itself against both Dennis’s and Conrail’s claims against it. Under Section 7.07(a) of the Trackage Rights Agreement, the MBTA is entitled to recover those costs and expenses from Conrail.
CONCLUSION AND ORDER
For the reasons stated, it is hereby ordered that judgment shall enter for the MBTA and against Conrail on all counts of Conrail’s Third-Party Complaint against the MBTA and of the MBTA’s counterclaim *353 against Conrail. Within fourteen days from this date, the MBTA shall serve on Conrail a statement of its expenses and attorneys fees, with reasonable documentation. Thereafter, the parties shall endeavor in good faith to reach agreement on the amount of expenses and reasonable attorneys fees to be awarded. If they fail to do so, Conrail shall serve its response on the MBTA, and the MBTA shall file the statement and response with the Court, within the time and in the manner provided under Superior Court Rule 9A.

The Court instructed the juiy that duty is an element of a claim for negligence, that the issue of duty in this case is one of law for the Court to decide, and that for purposes of resolving the factual issues submitted to it, the jury should assume the existence of a duty of ordinary care on the part of both Conrail and the MBTA

Exactly how Conrail interprets “provision of police protection” remains unclear. At times during trial Conrail seemed to be taking the position that the phrase means having a police officer, or perhaps even more than one, present at each station at sill times. It is this Court’s view that that interpretation lacks any foundation either in the text of the provision or in common sense, and that the only reasonable interpretation of the phrase is provision of whatever police protection is reasonably necessary under the circumstances of each particular station.

Conrail nevertheless appears to concede that the MBTA has discretion to decide which stations it will operate, at what locations.

There was conflicting evidence as to whether any bystanders were in the area.

Dennis testified that his intention was to “jaywalk," that is, to cross the tracks at a location other than the designated crossing.

The spur was outside the area of the passenger station, and was apparently on Conrail property.

There was conflicting evidence, and conflicting contentions between the parties, as to whether he had been drinking.

The evidence presented at trial left considerable doubt as to exactly why Dennis stepped into the path of the train, rather than waiting for it to pass. Conrail contended both that Dennis deliberately trespassed on the tracks in order to cross in a location where crossing is not permitted, and that he stumbled onto the tracks in a state of disorientation arising from intoxication and/or his earlier fall. The MBTA disputed the intoxication theory, but offered no real alternative explanation for Dennis’s conduct. The evidence would have supported a finding that he fell or stumbled from the platform onto the tracks, but the jury appears to have rejected that theory since it answered in the affirmative the question “Was Donald Dennis intentionally present, walking, or standing on railroad property at the time of his injury?”

This evidence came from several witnesses, one of whom was a Framingham police officer. That officer also testified that the station was part of his assigned patrol route, and that he stops there several times on each shift, in uniform, on each such occasion getting out of his marked cruiser and walking around the area of the station and platform. This corroborated the testimony of the MBTA police captain that, by agreement between the MBTA and local police chiefs, including that of Framingham, local officers, rather than MBTA police officers, patrol commuter rail stations.

The Framingham police officer’s characterization of the station as in a “high crime area” did not supply that missing piece; in context it is apparent that his comparison was with other areas of Framingham, not with other parts of the MBTA system.

Conrail’s witnesses testified to the sounding of bells and of the train whistle.