ANN W. MAGAW & another[1] vs. MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY.

Norfolk.    October 29, 1985. — November 22, 1985.

Present: GREANEY, C.J., PERRETTA, & KASS, JJ.

*Massachusetts Bay Transportation Authority*, Negligence. *Negligence,*
Carrier, Street railway, Foreseeability of harm. *Public Policy.*
*Damages,* Tort.

In an action against the Massachusetts Bay Transportation Authority to
recover for injuries sustained by the plaintiff when she was attacked and
robbed by two young men in an underpass at a subway station, evidence
warranted findings that the assault on the plaintiff was foreseeable and
that the authority was negligent. [132-135]
In an action against the Massachusetts Bay Transportation Authority brought
by a woman who had been attacked and robbed while using an underpass
at a subway station, there was no merit to the authority's contention
that the plaintiff should be barred from recovery as a matter of public
policy in order to prevent imposition of "unreasonable burdens on the
MBTA to insure the safety of every passenger." [136-137]
In an action against the Massachusetts Bay Transportation Authority by a
woman for personal injuries, sustained when she was attacked and robbed
in an underpass at a subway station, and by her husband for loss of
consortium and consequential damages, evidence warranted the jury's
award of damages in the amount of $60,000, in spite of the authority's
claim that, in light of the plaintiffs' combined medical bills and lost
income of $1,523.40, the jury's award was excessive and, in effect,
constituted punitive damages based on the jury's "dissatisfaction with
criminals and crime in general." [137-139]


CIVIL ACTION commenced in the Superior Court Department
on August 8, 1980.
The case was tried before *Andrew Gill Meyer*, J.
*Gerald M. Coakley* for the defendant.

---

[1] Charles Magaw.

*Robert E. Dinsmore* for the plaintiffs.

GREANEY, C.J. On Tuesday, June 19, 1979, between 8:45 and 9:00 A.M., Ann Magaw parked her car on Beale Street in Dorchester, intending to use the MBTA Ashmont station. As she approached the MBTA Beale Street pedestrian tunnel, she noticed a young man standing at the entrance. The tunnel, which was about twenty to twenty-five feet long, was open on both ends with about nine or ten steps leading into and out of it at either end. Magaw was about three feet into the tunnel when she noticed a tall young man coming toward her. She turned, and the young man she had seen outside was behind her. The two young men shoved her against the wall and to the ground in trying to steal her purse. Magaw attempted to resist, but eventually the muggers succeeded in taking her bag and fleeing the scene. Magaw was taken to the hospital.

Magaw brought an action in negligence against the MBTA seeking damages. Her husband, Charles Magaw, joined in the action seeking to recover for loss of consortium and consequential damages. A Superior Court jury heard the case and, in answer to special questions, found that the MBTA had been negligent, that the MBTA's negligence had proximately caused Magaw's personal injuries, and that she was free of any negligence. The single sum of $60,000 was awarded by the jury to cover the claims of both plaintiffs.

The MBTA has appealed, arguing that the trial judge erred in denying its motion seeking judgment notwithstanding the verdict or, in the alternative, a new trial.[2] The MBTA contends that (1) the plaintiffs have failed to show that the MBTA should reasonably have foreseen that any violent crime might be committed at the Beale Street tunnel in the morning hours of June 19, 1979, and thus did not meet their burden of proving causation; and (2) that any possible causal connection between any negligence on the part of the MBTA and the assault was severed by the intervening criminal act of third parties. If these arguments are unsuccessful, the MBTA further claims that

---

[2] At the trial, the MBTA moved for a directed verdict at the close of the plaintiffs' case and again at the close of all the evidence.

public policy requires a judgment in its favor since sustaining the result will impose "an impossible burden on the MBTA to insure the safety of all its passengers at every place and every time." Finally, the MBTA contends that, if liability is upheld, it should have a new trial on damages because the damages awarded were excessive.

1. *Liability.* We first discuss liability. The MBTA concedes that it owes a duty, consistent with the nature and extent of its powers, to protect its passengers from all dangers that are naturally and ordinarily to be expected. The MBTA further concedes that it is required to use proper precautions to protect its passengers from injuries caused by the misconduct of others that ought reasonably to be anticipated and guarded against. The concessions are proper. The MBTA is not an insurer. Nevertheless, "[it] is the long settled law of this Commonwealth that a common carrier owes to its passengers the highest degree of care in the anticipation and prevention of violence from its employees, other passengers, and even strangers, as is consistent with the nature and operation of its business." *Quigley* v. *Wilson Line of Mass., Inc.,* 338 Mass. 125, 128 (1958). The test is whether the MBTA could have anticipated, or guarded against, the act of violence committed in this case. Our inquiry, therefore, is directed to the issue of foreseeability. See the *Quigley* case, *supra* at 128.

In addition to the evidence summarized above, the plaintiffs' case contained the following evidence. The MBTA conceded that it controlled the tunnel. Ann Magaw testified that on June 15, the Friday prior to the incident, she had complained to an MBTA starter that the lights in the tunnel were out. The lights had not been repaired four days later on June 19 when Magaw entered the dark tunnel. Because the stairs to the tunnel are outside, a pedestrian like Magaw would actually have to enter the tunnel before realizing that the lights were out.

While she was being assaulted, Ann Magaw screamed for help for two to five minutes. The place of the assault was about thirty yards from a toll booth; four MBTA employees

were working at the Ashmont station at the time.[3] Ann Magaw testified that while she was being assaulted in the tunnel she did not hear a train passing over the tunnel.[4] Her husband testified that later that day, as well as on the next day, he went to the station and that from the area of the toll booth he could hear people walking through the tunnel.

Officer Michael McDonough of the MBTA police testified from MBTA police records that in the fifty-day period from May 1, 1979, up to the assault on June 19, 1979, there had been thirty-eight incidents at, or in the vicinity of, the Ashmont station. All the incidents were reported to, and recorded by, the MBTA police. These incidents included the stoning of buses at the station; the ejection of disorderly persons and drunks from the station on fifteen occasions; two fights; various acts of vandalism; five episodes involving disorderly persons; reports of youths blocking the entrance to the station; the need to tow abandoned motor vehicles; the ejection from the station of three boys carrying axes; trespassing; and a report of a purse lost or stolen at the station. Officer McDonough also testified that he considered most of the occurrences described in the reports as "serious" in nature.

In determining whether the evidence was sufficient to overcome the MBTA's motion for judgment notwithstanding the verdict, we must ascertain whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff. If any such combination of circumstances could be found it is . . . immaterial how many other combinations could have been found which would have led to conclusions adverse to the plaintiff." *Campbell* v. *Thornton,* 368 Mass. 528, 535 (1975).

Under this standard, we think that the judge properly ruled that the issue of foreseeability was for the jury. First, Officer

---

[3] These employees consisted of an inspector (who was a street railway police officer), two collectors, and a porter.

[4] The Beale Street tunnel goes under the MBTA train tracks and exits on the Radford Lane side of the station.

McDonough corroborated Ann Magaw's testimony that the Beale Street tunnel lights were out on the morning of the robbery. The jury could have found that the MBTA had notice of the need to replace the lights and had done nothing about them. Whether inadequate, indeed nonexistent, lighting in the tunnel was a contributing factor in bringing about the assault was for the jury to resolve. They could reasonably have concluded that the assailants chose to lie in wait at the tunnel for a victim precisely because the tunnel was unlit. As was noted in *Kenney* v. *Southeastern Penn. Transp. Authy.,* 581 F.2d 351, 355 (3d Cir. 1978), a case where a female plaintiff was raped on an unlighted section of the defendant carrier's premises, "The presence of adequate lighting is recognized as a discouragement to violent criminal activity, particularly in an area where members of the public may be expected. Traditionally, adequate street lighting has been advocated as an effective means of reducing crimes against the person, such as robbery, assault and rape."

More directly, the jury could have considered the repeated unsavory, and sometimes violent, activities at or near the subway station, all of which were known to and recorded by the MBTA, as creating a situation that was dangerous to persons using the station. In this regard, the jury could have noted that there had been almost an incident a day at the Ashmont station, including one on each of the two days preceding the date of the attack on Magaw. The jury could have placed particular reliance on the testimony of MBTA Officer McDonough that he considered the incidents as "serious," and noted that the tunnel itself may have been the site of yet another incident within the fifty-day period discussed at trial.[5]

---

[5] The discussion in *Mullins* v. *Pine Manor College,* 389 Mass. 47, 55 & n.12 (1983), rejecting cases from other jurisdictions holding that "an owner or occupier of land is under no duty to protect persons lawfully on the premises against the criminal acts of third persons unless prior criminal acts have occurred on the premises" does not control the result in this case. As the *Mullins* decision notes, its rejection of those cases is limited to their lack of usefulness in resolving the "circumstances before [the court]" in *Mullins.* In this case, the number and nature of the incidents, all close in

The MBTA argues that it had no reason to anticipate criminal activity specifically in the Beale Street tunnel since the other incidents occurred, principally, at other locations in or outside of the station. We disagree. Many serious incidents, known to the MBTA police, had occurred throughout the Ashmont complex. These incidents, combined with the absence of lighting at the tunnel, could have been viewed by the jury as creating a climate of danger. The jury could have found that the record known to the MBTA warranted practical measures, including maintenance of adequate lighting and better security, to protect passengers in all parts of the station including the tunnel. The jury could have also found that the station is not so large or laid out in so complex a fashion as to render security patrols throughout it and at the tunnel impractical. So viewed, and given the high duty of care owed by the MBTA to its passengers, see *Quigley* v. *Wilson Line of Mass., Inc.*, 338 Mass. at 128, the Magaws' proof was sufficient to prevail on the issue of foreseeability. In the circumstances, the governing test for foreseeability is the one stated in *West* v. *Molders Foundry Co.*, 342 Mass. 8, 12 (1961), as follows: whether "the probable consequence of [the defendant's] acts was that harm of the same general character as that which came to the plaintiff would come to persons who stood in the same general relation to the defendant as the plaintiff." In applying this test, "it is not necessary to make out liability on a defendant's part that the particular series of events which ended in the [plaintiff's]

---

time to the crime which gave rise to this lawsuit, could have been found sufficient by the jury to put the MBTA on notice that its security at the station was inadequate.

However, incidents can be so few in number, or so inconsequential in degree, that a judge could permissibly rule, as matter of law, that they are legally insufficent to put a carrier on notice that some or improved security is necessary. Moreover, in a case like the present one a defendant may wish to request an instruction to the jury, as part of the instructions on foreseeability, which focuses the jury on the incidents which are relied upon by a plaintiff as the foundation for foreseeability, and which asks them to ascertain whether the incidents are of such number, frequency or degree that a reasonable carrier, in all the circumstances of the case, should have known that a future crime was likely to happen.

injury . . . were the probable consequences of the defendant's acts." *Id.* at 12-13, quoting from *Ogden* v. *Aspinwall,* 220 Mass. 100, 103 (1915). Rather, foreseeability is established if the carrier has "reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of [its invitees], even though [the carrier] has no reason to expect it on the part of any particular individual." Restatement (Second) of Torts § 344 comment f (1965).

Our conclusion that the MBTA should have foreseen the risk of a criminal attack also disposes of the MBTA's contention that the judge should have ruled, as matter of law, that the intervening criminal acts of unknown third parties were a supervening cause that broke the chain of proximate causation. "The act of a third party does not excuse the first wrongdoer if such act was, or should have been, foreseen." *Mullins* v. *Pine Manor College,* 389 Mass. 47, 62-63 (1983), and cases cited. See also Restatement (Second) of Torts § 449 comment b (1965). As the *Mullins* decision points out, this rule applies to the criminal act of a third party. There is nothing else argued by the MBTA on this phase of the case which persuades us that the MBTA was entitled to judgment as matter of law.[6]

---

[6] The MBTA cites as analogous such "crowd" cases as *MacGilvray* v. *Boston Elev. Ry.,* 229 Mass. 65 (1918), and *LoPresti* v. *Metropolitan Transit Authy.,* 345 Mass. 374 (1963), in which plaintiffs sought to recover from the carriers for injuries resulting from the pushing and shoving of crowds of subway passengers. These cases, unlike the present one, deal with the commonplace "incidents of such travel." *LoPresti* v. *Metropolitan Transit Authority, supra* at 375. The present occurrence was not "unavoidable in view of the nature and extent of the defendant's business." *MacGilvray* v. *Boston Elev. Ry., supra* at 67. While a common carrier need not anticipate every possible peril that may befall its passengers, *Isenberg* v. *New York, N.H., H.R.R,* 221 Mass. 182 (1915), the assault on Magaw was neither so unavoidably routine nor so "impossible or highly improbable," in view of the record of incidents at the Ashmont station, as to be unforeseeable to the MBTA. *Id.* at 183. Moreover, the presence at Ashmont on the morning of the assault of an inspector who was a street railway police officer also counters the MBTA's assertion that it could not have foreseen the need for some sort of police presence for users of the station. Because the MBTA's answers to interrogatories (which were in evidence) indicated

2. *Public policy.* The MBTA further argues that public policy requires that it not be held liable in circumstances like those presented in this case. It contends that sustaining the recovery will "impose unreasonable burdens on the MBTA to insure the safety of every passenger, in every place on its vast properties and vehicles." The MBTA urges that a more restricted standard of liability should be imposed lest "[t]he economic hardships flowing from an unreasonable duty to provide every possible safety precaution to the public . . . place an even greater burden on an already debt-ridden system."

The MBTA does not indicate whether the Legislature, as an important arbiter of public policy, has been asked to consider the merits of a limitation on the MBTA's tort liability for personal injury. General Laws c. 161A, the statute governing the MBTA's affairs and operations, contains no such limitation, and § 21 of that statute permits recovery in tort to MBTA passengers who are injured without any express reference to the amount of damages. By way of contrast, the Legislature in G. L. c. 258, § 2, has limited the exposure of municipalities for personal injury damages to a sum not to exceed $100,000 per plaintiff. The Legislature has also imposed lesser financial limitations upon damages recoverable for injuries sustained because of defects in highways (G. L. c. 81, § 18), and in ways (G. L. c. 84, § 15). The existence of such provisions in other statutes involving public entities demonstrates the Legislature's familiarity with the possibility of imposing a cap upon the recovery available to successful plaintiffs. "'[I]f the omission [of such a limit on liability from G. L. c. 161A] was intentional, no court can supply [one]. If the omission was due to inadvertence, an attempt to supply [a limitation] . . . would be tantamount to adding to a statute a meaning not intended by the Legislature.'" *Rogers* v. *Metropolitan Dist. Commn.,* 18 Mass. App. Ct. 337, 339 (1984).

---

that the inspector's presence was a "security precaution," the jury could have concluded that the MBTA had anticipated just such a need.

Lastly, "[i]t is of no avail for the [MBTA] to argue that there was some or even much evidence which would have warranted a contrary finding by the jury." *Valade* v. *Springfield,* 7 Mass. App. Ct. 13, 15 (1979). The MBTA's rehearsal of the facts of the case throughout its argument goes principally to the weight or to the credibility of the evidence. These were matters for the jury to decide.

Further, we see no reason to attempt to fashion, by judicial decision, a more restrictive test of foreseeability solely to limit damages incurred by the MBTA as a result of its acts of negligence. Contrary to the MBTA's argument, our upholding of the jury verdict will not make it an absolute insurer. Each claim will have to be carefully screened on its own facts by the trier of fact.[7] On the facts viewed most favorably to the plaintiffs, this case was for the jury.

3. *Excessive damages.* We reach the MBTA's last argument that the $60,000 award of damages was excessive and, in effect, constituted punitive damages. It is suggested that as a result of distorted media coverage of transit crime the jury sought to express their "and the general community's dissatisfaction with criminals and crime in general." To remedy the perceived injustice, a new trial is sought.

The disproportion between the plaintiffs' combined medical bills and lost income of $1,523.40 and a verdict of $60,000 is a proper factor for a trial judge to take into account when deciding whether the jury has awarded excessive damages. See *Griffin* v. *General Motors Corp.,* 380 Mass. 362, 371 (1980). Nevertheless, "in deciding whether a jury award is excessive or inadequate the trial judge has his traditional dis-

---

[7] The limitation of liability will of necessity depend on the situation in a given case. We think the observations of Judge Henry in his dissent in *Cornpropst* v. *Sloan,* 528 S.W.2d 188, 201 (Tenn. 1975), aptly describe the limitation:

"[T]he standard of care is not fixed, rigid or inflexible and should, perforce of necessity be modified, adjusted and adopted to meet a standard of fairness and justice under the facts and circumstances of each particular case. It is evident that the degree of care must be commensurate with, and bear some relation to, the risk involved. It is evident that no [carrier] is required to be an insurer. It is evident that any standard must be reasonably applied to the end that its application not work an undue hardship on any business activity. It is evident that no standard should require anything beyond protection against reasonable estimates of probabilities. It is evident that a [carrier] is not required to protect [its] invitees against remote or conjectural possibilities nor to 'waste . . . anxiety upon events that are barely possible' . . . . In summary, the guidelines should be given a reasonable, realistic and fair interpretation."

cretion, and his view that the jury verdict should stand would generally be respected by an appellate court, at least where damages were unliquidated." *Griffin* v. *General Motors Corp.*, *supra*, quoting from *Freeman* v. *Wood*, 379 Mass. 777, 781 n.9 (1980).

In evaluating the damages suffered by the Magaws, the jury could have drawn upon the following evidence. Medical examination of Ann Magaw revealed a comminuted fracture of the middle joint of her right middle finger. As a result of this injury, Magaw, who is right-handed, lost one month's work and was unable to resume her ordinary duties as a secretary and typist for three additional months. Following the injury, she experienced excruciating pain, was unable to sleep for several days, and later suffered from an infection at the site of the injury. She had to wear a cast and sling for at least three months.

The jury could have observed that Magaw had been left with "moderately severe" disfigurement of her right middle finger, which has a restricted range of motion. She has lost fifty percent of the function of the injured finger and, consequently, between twenty-five and thirty percent of the function of the right hand as a whole. Her physician stated that tests he conducted showed that Magaw has a grip of 140 pounds with the left hand, but zero in the right.

There was also evidence that Magaw has developed traumatic arthritis in her right hand. The evidence indicated that, although Magaw had never regained full use of her finger, she has reached an "end result." The prognosis for her hand offered by her physician is that the arthritis will worsen as she gets older.

Magaw also testified about her reduced ability to perform commonplace chores at home and in her workplace. She stated that the condition of her hand prevents performance of simple household tasks such as opening jars or lifting pots and pans. She is unable to close her hand to pick up or hold small objects like coins or earrings or to do simple cooking chores like peeling a potato. At work, she testified, her typing speed has fallen from seventy-five words per minute to approximately

forty-five words per minute. She has had to develop compensatory techniques to perform the office work that her job entails.

Finally, the jury could have considered the evidence as to the permanent character and consequences of the disabilities Magaw suffers as a result of the attack. Her physician testified that her age makes her an inappropriate candidate for surgery to replace the damaged joint. His testimony that her arthritis will worsen over the years could have been viewed in the light of mortality tables introduced in evidence.

The amount of the damages awarded in this case is not so extraordinary as to lead us to conclude that the verdict is, as the MBTA argues, a shocking instance of jury vigilantism in retaliation for subway crime. All of the above and some additional evidence pertaining to her injuries that has not been discussed, including emotional distress during and after the attack, warranted the jury's verdict of damages and justified the judge's refusal to reduce that verdict.

> *Order denying motion for judgment notwithstanding the verdict or for a new trial affirmed.*
>
> *Judgment affirmed.*