Fabricant, J.
This wrongful death action arises from a collision between an MBTA green line train and a pedestrian at the intersection of Beacon Street and St. Paul Street in Brookline, shortly after 11:00 p.m. on the evening of December 24, 1994, causing the pedestrian to become stuck under the train, where he died of asphyxiation. The case was tried to a jury between September 11 and September 22; 2000. The plaintiff presented to the jury two separate theories of liability, one involving the operation of the train, and the second involving the MBTA’s unsuccessful attempt to extricate the decedent from under the train after the collision. The jury returned a verdict, on special questions, finding liability on both theories. The jury also found the decedent negligent with respect to the collision, and apportioned negligence on that aspect of the case seventy percent to the MBTA and thirty percent to the decedent. The jury found that the MBTA’s conduct with respect to the rescue attempt, but not the operation of the vehicle, was wilful, wanton and reckless, or grossly negligent. The jury awarded compensatory damages of one dollar for wrongful death and ten thousand dollars for conscious pain and suffering, and punitive damages of twenty-seven million, five hundred thousand dollars.
Presently before the Court are the defendant’s motion for judgment notwithstanding the verdict, motion for new trial and/or remittitur, and motion to alter the judgment.[1] After hearing on these motions, and having considered all evidence and arguments presented at trial, as well as all post-judgment submissions, including supplemental submissions received after the hearing, the Court concludes and orders as follows.
I. Defendant’s Motion for Judgment Notwithstanding the Verdict.
In considering the defendant’s motion for judgment notwithstanding the verdict, the Court must determine whether the evidence presented at trial, viewed in the light most favorable to the plaintiff and without regard to weight or credibility, supports the jury’s findings. See Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992); Tosti v. Ayik, 394 Mass 482, 494 (1985); D’Annolfo v. Stoneham Housing Authority, 375 Mass. 650, 657 (1978); Magaw v. MBTA, 21 Mass.App.Ct. 129, 132 (1985). The question is not how the Court would have evaluated the evidence, but whether “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff. If any such combination of circumstances can be found it is . . . immaterial how many other combinations could be found which would have led to conclusions adverse to *622 the plaintiff.” Id. at 132, quoting Campbell v. Thornton, 368 Mass. 528, 535 (1975).
The defendant’s motion challenges the sufficiency of the evidence as to four separate elements of the, claims on which the jury found for the plaintiff. First, the defendant argues that it was entitled to judgment on the claim of negligence in connection with the rescue attempt because it had no duty of care toward the decedent with respect to the rescue. Second, it argues that the evidence was insufficient to prove that any negligence in connection with the rescue attempt was a proximate cause of the decedent's death, in that the evidence did not establish how long a non-negligent effort to extricate the decedent would have taken, or whether the decedent would have survived if extricated at that time. Third, the defendant argues that the evidence was insufficient to establish liability for punitive damages, in that it did not support a finding of wilful, wanton or reckless conduct or gross negligence. Finally, the defendant challenges the finding of liability for conscious pain and suffering, arguing that the evidence failed to establish that the decedent experienced any such suffering. The Court will address these arguments in turn.
On the issue of duty, the defendant argues that it was in the position of a volunteer, making a gratuitous effort, without any responsibility for the effectiveness of its attempt. It cites Fondow v. United States, 112 F.Sup.2d 119 (D.Mass., 2000) (Coast Guard attempting rescue at sea not liable for negligence absent showing that its conduct increased risk). The Defendant’s argument in this regard fails for at least three reasons.
First, the jury found, based on sufficient evidence, that the defendant’s negligence was a substantial contributing factor in causing the accident. Thus, the defendant was not a mere volunteer offering assistance to an unrelated victim; it was a tortfeasor obligated to mitigate the harm it had contributed to causing. Restatement (Second) of Torts, §322. Cf. Cremins v. Clancy, 415 Mass. 289, 296 (1993), O’Connor, J., concurring (absent statute or special relationship, “no person owes to another a duty to prevent the harmful consequences of a condition or situation he or she did not create”).
Second, the MBTA holds a position quite different from that of an ordinary motorist, who would not be expected to anticipate and prepare for rescue of a person trapped under a vehicle. The MBTA is charged by the legislature with operating a comprehensive system of public transportation throughout the Metropolitan Boston area. See generally, G.L.c. 161 A, §1, et seq. For that purpose, it owns both real estate and equipment, and maintains personnel and administrative units for maintenance, security, and emergency response. The MBTA is in a far better position than anyone else, including local fire departments or other emergency services, to anticipate and plan for foreseeable mishaps involving its vehicles, and particularly to identify and to have readily available the type of jacking equipment that would most expeditiously and reliably lift a train when necessary to free a person trapped underneath.
Third, and perhaps most important, the evidence presented at trial supported a finding that the defendant had specifically directed local fire departments to rely on it for emergency operations requiring jacking of trains, and that as a result of that specific direction the Brookline Fire Department had ceased to carry jacking equipment on its fire engines. This evidence was sufficient to support the jury’s determination that the defendant had a duty to exercise ordinary care in its rescue effort. See generally, Davis v. Westwood Group, 420 Mass. 739, 746 (1995); Mullins v. Pine Manor College, 389 Mass. 47, 53-54 (1983); Ballou v. Boston & Maine Railroad, 341 Mass. 696, 699 (1961); Black v. New York, N.H.&H. Railroad, 193 Mass. 448, 450 (1907); Magaw v. MBTA, 21 Mass.App.Ct. at 135; Restatement (Second) of Torts §323 (1965).
The defendant next challenges the sufficiency of the evidence on the issue of causation, arguing that the evidence failed to show how long a non-negligent rescue would have taken, and whether the decedent would have survived that long. The defendant relies on Hoyle v. Southern Bell Telephone, 474 F.Sup. 1350, 1355 (W.D.N.C. 1979), affirmed 631 F.2d 728 (4th Cir. 1980) (defendant entitled to summary judgment where allegation that delay in telephone repair caused death depended on “many facts which can never be determined”). The evidence of causation in this case, however, was substantially stronger than that offered in Hoyle. There was evidence here that emergency personnel, including both Brewster ambulance driver John Ahern and Captain Babcock of the Brookline Fire Department, arrived on the scene within a very few minutes, well before the MBTA’s emergency truck, even though they came from equivalent distances. There was evidence also that manually operated jacks had successfully extricated a person trapped under an MBTA train in the past,[2] and that MBTA emergency personnel knew from past experience that manual jacks are faster than hydraulic jacks. Based on the evidence presented, the jury could have found that a reasonable person in the position of the MBTA would have identified the type of jack that would lift the type of train involved most quickly and reliably, and would adopt and implement a policy of keeping jacks of that type on its emergency vehicles, which it would keep adequately staffed at all times, ready to respond promptly when and where needed.
That finding, together with the medical and other evidence, would be sufficient to establish causation. Dr. Kury testified that the cause of the decedent’s death was asphyxiation due to chest compression, that complete chest compression would take at least five minutes to cause death, that incomplete compres *623 sion could take up to an hour to cause death, and that the compression in this case was not complete. Brook-line firefighter Gonzalez, who the jury could have found arrived after Brewster ambulance driver Ahern, testified that he detected a pulse, and Brookline firefighter Gregorio testified that, some ten minutes later, he heard a gurgling sound that, in Dr. Kury’s opinion, was consistent with life. From all the evidence, the jury could have concluded that the decedent was alive for at least fifteen to twenty minutes after the accident occurred, and perhaps longer. The medical evidence did not show physical injuries that would have caused death independently of the chest compression; the juiy thus could have concluded that the decedent would have lived if the chest compression had been relieved at any time before it caused his death. On the evidence presented, the jury could reasonably have concluded that a non-negligent rescue effort, performed after appropriate planning and preparation, would have resulted in the victim’s extrication before the time when firefighter Gregorio heard the sound he described, and that in that event, more likely than not, the decedent would have survived.
The defendant next argues that the evidence was insufficient to support liability for punitive damages, in that it did not show wilful, wanton or reckless conduct or gross negligence. The Court agrees as to wilful, wanton or reckless conduct, but not as to gross negligence.[3] Wilful conduct is intentional conduct, undertaken with a specific intent to cause harm. See Sandler v. Commonwealth, 419 Mass. 334, 335 (1995); Gage v. Westfield, 26 Mass.App.Ct. 681, 691 (1988). Nothing in the evidence in this case suggests that any employee or official of the defendant acted, or failed to act, with any intention to cause harm to anyone. Wanton or reckless conduct involves action or inaction despite knowledge of “a high degree of likelihood that substantial harm will result to another ... a disregard of probable harmful consequences.” Commonwealth v. Correia, 50 Mass.App.Ct. 455, 458 (2000) (internal quotations and citations omitted), see Sandler v. Commonwealth, 419 Mass. at 336-37; Manning v. Nobile, 411 Mass. 382, 388 (1991); Commonwealth v. Welanskg, 316 Mass. 383, 399 (1944); Gage v. Westfield, supra. Here, the evidence supported a determination that an accident of the type that occurred was foreseeable, based on both common sense and prior experience, but not that it was likely or probable. To the contrary, the only evidence of past history — two incidents some twenty-five years before — indicated that such an event was infrequent and therefore highly unlikely at any particular time.
Gross negligence, as described by the Supreme Judicial Court in Altman v. Aronson, 231 Mass. 588, 591-92 (1919), is “materially more want of care than constitutes simple inadvertence.” It is “very great negligence, or the absence of slight diligence, or the want of even scant care ... a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.” See Davis v. Walent, 16 Mass.App.Ct. 83, 92-93 (1983). From the evidence presented, the jury could have found that the defendant failed to exercise reasonable care in multiple aspects of anticipating, preparing for, and executing the rescue of a pedestrian trapped under its vehicle after having been struck by that vehicle. The jury could reasonably have found negligence in a set of numerous, distinct acts or omissions by a number of MBTA personnel at various levels.
Perhaps most egregious was the decision, for reasons never explained in the evidence, to rely exclusively on generator-operated hydraulic jacks, available only on MBTA emergency vehicles operated by MBTA emergency crews, as the sole means of lifting light rail vehicles when necessary in emergencies, despite the known existence of portable, manually-operated jacks capable of lifting such vehicles more quickly and reliably, and operable by local fire department personnel. From the evidence presented the jury could have found that the MBTA made that decision, and that it implemented its decision by encouraging local fire departments to remove mechanical jacks from their trucks, by removing such jacks from its own emergency vehicles, and by making no provision for keeping such jacks on its light rail vehicles. The jury could also have found that the effect of that decision was to ensure that, in the event of an emergency of a type that was foreseeable in light of the nature of the MBTA’s operation, as well as in light of past experience, even if the MBTA’s equipment were fully operational and were deployed promptly, the delays necessitated by its set-up and use would expose a person trapped under a vehicle to unnecessarily increased risk of death.
The jury could have found that, having decided to rely exclusively on hydraulic jacking equipment kept on its emergency trucks, the MBTA then failed to maintain that equipment in good operating condition, and to keep its emergency vehicles supplied with necessary tools. It was firmly established in the evidence, indeed undisputed, that once the emergency vehicle arrived at the scene, the jack failed to perform its function because the compressor necessary to operate it failed to start. The jury could have found from the evidence that this failure resulted from a dirty spark plug, a condition preventable by routine maintenance. Further, the evidence indicated that although the staff members operating the emergency vehicle were competent to perform mechanical repairs, the emergency vehicle lacked basic tools necessary to do so. Although the evidence failed to identify precisely where or when the breakdowns in maintenance occurred, the evidence left no room for doubt that the MBTA failed either to have or to implement a system of regular inspection and maintenance of emergency equipment and supplies sufficient to ensure that all *624 such equipment and supplies would be present and fully operational when needed in an emergency.
The jury could also have found, although the evidence was less strong on this point, that a series of delays occurred in the communications, and responses, among the various personnel involved in the rescue effort, such that the emergency vehicle failed to arrive at the scene with reasonable promptness.[4] Further, the jury could have found from the evidence that MBTA personnel acted unreasonably in directing a second emergency vehicle that had reached a location near the scene to return to its origin without yet having ascertained that the emergency equipment on the scene was in working order.[5]
In sum, the evidence established a lot of negligence, at various levels in the MBTA hierarchy, involving numerous distinct aspects of its operations. The quantity of negligence, considered in light of the emergency nature of the functions involved, could reasonably be found to rise to the level of gross negligence. Whether the Court would have so found is immaterial; the jury did, and the evidence supports its finding.
As to conscious pain and suffering, the defendant’s argument fails to acknowledge the substance of Dr. Kury’s testimony, or to consider it in the light most favorable to the plaintiff, as is required for purposes of this motion. Dr. Kuiy testified, based on ample medical expertise, that the skull fracture the decedent received from the initial impact of the train was not in itself so severe as to cause loss of consciousness. Rather, in Dr. Kury’s opinion, the decedent lost consciousness as a result of chest compression, and then died of asphyxiation from that same cause. The chest compression, the jury could have reasonably found based on Dr. Kuiy’s testimony, along with all the other evidence, arose from the position of the decedent’s clothing around his upper body while he was wedged under the train. Thus, the jury could have found, based on all of the evidence, that the decedent remained conscious during the period of time from when the train first struck him, as he was pulled underneath and becoming wedged, until the time when the resulting chest compression became so severe as to cause his loss of consciousness. Common sense alone is sufficient to indicate that during this time, however brief it may have been, the decedent must have experienced both physical and mental suffering; indeed a jury could reasonably conclude, based on its own life experience, that the decedent’s mental state must have been one of sheer terror. Cf. Gage v. Westfield, 26 Mass.App.Ct. at 696 (“pre-impact fright” not compensable).
Dr. Kury was unable to estimate the amount of time that passed as these events occurred, and the evidence did not otherwise support any estimate. But the absence of evidence as to the amount of time does not mean that there was no such time; common sense indicates that there was some, if only seconds, or even a fraction of a second. Royal Indemnity Co. v. Pittsfield Electric Co., 293 Mass. 4, 8 (1935) (“very brief period” sufficient). The amount of the jury’s damage award for conscious pain and suffering indicates no irrationality on this point; to the contrary, the relatively small size of this award suggests that the jury found the time to have been brief. That finding is fully supported by the evidence.
The defendant relies on Fialkow v. DeVoe Motors, 359 Mass. 569, 575 (1971), and Carr v. Arthur D. Little, Inc., 348 Mass. 469, 475 (1965). Each of those cases addressed the question of whether evidence supported a conclusion that the decedent experienced conscious suffering during a period of time after the accident, when witnesses observed bodily movements or sounds. In the contexts of those cases as presented, the Court held the manifestations observed by the witnesses insufficient to establish consciousness. Here, unlike in the cases cited, the evidence of consciousness does not involve sounds or body movements,[6] but rather logical inferences from expert medical testimony as to the cause of loss of consciousness. The evidence was sufficient to support the inference that the decedent remained conscious, and experienced suffering, after the initial impact, albeit for a very short time.
II. The Defendant’s Motion for New Trial and/or for Remittitur.
In considering the defendant’s motion for a new trial and/or for remittitur, the Court’s task differs from its role with respect to the motion for JNOV. The Court must consider the weight of the evidence, but may not merely substitute its judgment for that of the jury. Rather, the Court may grant a new trial only upon a determination that the verdict is “so greatly against the weight of the evidence as to induce in [the judge’s] mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.” Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 802 (1987). See Turnpike Motors, Inc., v. Newbury Group, Inc., 413 Mass. 119, 127 (1992); Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 520, cert. denied, 493 U. S. 894 (1989).
The defendant argues that the verdict was against the weight of the evidence for the same reasons that, in its motion for JNOV, it argued that the evidence was insufficient. The Court rejects these arguments for the reasons already discussed. The defendant also argues that the jury was unfairly prejudiced by evidence of the absence of an alcohol test of the train operator. The jury’s finding of no wilful, wanton or reckless, or grossly negligent conduct in connection with the collision belies this contention; if the jury had misused the evidence of the lack of an alcohol test as a basis for finding that the operator was impaired by alcohol, it likely would have found recklessness or gross negligence in the operation of the train.
*625 Lastly, the defendant argues that the amount of the punitive damages award is excessive. On this point, the Court agrees. The Supreme Judicial Court has mandated that trial courts review punitive damage awards to ensure that they are not excessive or unreasonable, in light of the following three factors: (1) the degree of reprehensibility of the defendant’s conduct; (2) the actual harm inflicted on the plaintiff; and (3) comparison with any civil or criminal penalties that could be imposed for comparable misconduct. See Labonte v. Hutchins & Wheeler, 424 Mass. 813, 826-27 (1997).[7] The Court in that case noted certain additional considerations that may assist in evaluation of the reasonableness of the award, as discussed in the concurring opinion of Justice Breyer in BMW of North America v. Gore, 517 U. S. 559, 589-92 (1996). Those considerations include: whether the award bears a reasonable relationship to the harm that is likely to occur and that has occurred from the defendant’s conduct; whether it removes the profit of an illegal activity by being in excess of it so that the defendant recognizes a loss; whether it reflects the financial position of the defendant; whether it factors in the costs of litigation so as to encourage plaintiffs to bring wrongdoers to trial; whether criminal sanctions have been imposed; and whether other civil actions have been filed against the same defendant. Having considered each of these factors insofar as applicable to the facts of this case, this Court concludes that the juiy’s award of punitive damages is so far in excess of any reasonable amount as to constitute a miscarriage of justice.
The first, and perhaps most important, factor is the degree of reprehensibility of the defendant’s conduct. In considering this factor, it is necessary to acknowledge at the outset that the issue arises under Massachusetts law only with respect to conduct that is reprehensible at the lowest end of the range, since our law does not permit punitive damages for anything less than gross negligence. The question, then, is not whether the conduct was bad in the abstract, or as compared with ordinary negligence, but where it falls within the spectrum of the egregious conduct for which the law authorizes punitive damage awards.
Here, as discussed supra, the evidence supported the jury’s finding of liability for punitive damages based on gross negligence. The conduct that could be found from the evidence, however, remains by its nature negligence, and not something worse. The MBTA was careless; it failed to anticipate a foreseeable emergency, and to adopt and implement systems reasonably calculated to respond effectively to such an event. It did not deliberately decide to cause harm, or to subject anyone to a likelihood of harm, or to assume such a risk for the sake of some countervailing benefit to itself. To the contrary, nothing in the evidence indicates that the MBTA obtained, or could have expected to obtain, any benefit of any kind from the conduct in issue. In particular, the evidence is entirely devoid of anything to indicate that the failures involved here saved the MBTA any money, or resulted from any effort to save money. The MBTA's conduct, negligent as it was, must therefore be viewed as at the relatively mild end of the range of conduct for which Massachusetts law authorizes punitive damages.
The actual harm inflicted was great, in that a life was lost. The conduct on which the punitive damage award is based, however, was not the sole cause of the death. Before this conduct came into play at all, the decedent was in a position of great risk to his life, having come to be in that position, as the jury found, through a combination of ordinary negligence on the part of the MBTA operator and the decedent’s own negligence. The role of the conduct in issue here was to deprive the decedent of the chance that he would have survived the collision if he had been freed from under the train as quickly as reasonably possible under the circumstances. That role was important; as the jury found, it was a substantial contributing factor in causing the death. In evaluating the harm inflicted for purposes of reviewing the punitive damage award, however, the combination of factors producing the harm warrants recognition.
The third Labonte factor is comparison of the punitive damage award with any civil or criminal penalties that could be imposed for comparable misconduct. No such penalties exist under Massachusetts law for gross negligence resulting in a death.
Of the additional factors referenced in Justice Breyer’s concurrence in BMW of North America v. Gore, two closely-related factors weigh strongly in favor of remittitur: the removal of any profit motive, and the financial position of the defendant. The MBTA, as a public transportation authority, does not and cannot, under any circumstances, make a profit. The comparable motivation for this type of entity would be cost savings. The analogous question, then, is how much of a damage award would be necessary to exceed any cost savings realized by the MBTA as a result of its conduct. As discussed supra, however, nothing in the evidence indicates that the conduct in issue produced or was intended or expected to produce any savings, or that cost considerations had any role in causing the MBTA’s conduct. Thus a damage award in any amount exceeds the non-existent financial benefit, and provides a motivation for change, insofar as money motivates the conduct of this defendant at all.[8]
The evidence presented at trial did provide some insight into the financial circumstances of the MBTA. Its assets consist of the land and equipment that it holds for the purpose of serving its public function, along with cash reserves. Diversion of such assets, even if not presently in use, to satisfy this judgment, would inevitably risk adverse impact on the members of the public who depend on the MBTA for transportation. The MBTA’s fare collections, together with incidental revenues from such activities as the sale of advertising space and leasing of real property, rather than generating a surplus that could satisfy a judgment, fall far short of its operating budget. The differ *626 ence is made up by public funds, provided in the form of annual assessments on participating municipalities and state legislative appropriations, supplemented by federal grants.[9] Thus, the punitive effect of the damage award would inevitably fall not on those who actually committed the misconduct, but on the taxpayers. See Clifton v. MBTA, Suffolk Superior Court No. 95-2686H, 11 Mass. L. Rptr. 316 (Gants, J., February 3, 2000), at 18. Cf. City of Newport v. Fact Concerts, Inc., 453 U. S. 247, 267-71 (1981) (discussing policy considerations underlying municipal immunity from punitive damages, in context of construing federal civil rights act as preserving that immunity).[10]
The factor of litigation costs does not support a large punitive damage award here.[11] Common experience in the court system indicates that potential plaintiffs and their counsel suffer no lack of incentive to bring meritorious wrongful death actions. Although factual circumstances unique to this case resulted in minimal compensatory damages, successful wrongful death cases in general tend to bring compensatory damage awards sufficient to provide ample incentive.[12] In this regard, wrongful death cases differ substantially from consumer protection, civil rights, and certain other statutory causes of action that vindicate important public policies even in cases involving minimal actual damages. Compare BMW v. Gore, 517 U. S. at 564 (plaintiff claimed actual damages of $4,000 from alleged fraudulent conduct pursuant to nationwide policy). Plaintiffs and their counsel may lack economic motivation to bring such cases without the potential for large punitive damages awards. Wrongful death claims such as this are not in that category.
Justice Breyer’s first factor, the relationship between the award and the actual and likely harm, overlaps with the factor already discussed of the actual harm the conduct inflicted. The difference, if one exists, is in consideration of the likelihood of future harm — that, is how likely it is that similar events will occur in the future, absent any effective remedial measures that punitive damages might stimulate, and that would not otherwise be undertaken. In this regard, it warrants note that, as discussed supra, the harm that actually occurred, although foreseeable, was hardly likely. The evidence identified only two previous occasions when pedestrians had become stuck under MBTA trains, both decades earlier and involving different kinds of trains than the one in issue here. The evidence did not explain how those incidents occurred, or to what extent any negligence on the part of those individuals contributed.
Further, the evidence indicated that some preventive measures have already occurred: the MBTA has provided local fire departments with manual jacks for the type of vehicle involved here, and has adopted measures for regular inspection and maintenance of equipment. The evidence left considerable room for doubt, however, as to whether the MBTA has undertaken to train its own personnel, as well as fire departments, on the use of mechanical jacks, and whether it has made any change in staffing policies. The MBTA has not undertaken to place jacks on its light rail vehicles, and offered nothing at trial to explain that decision.
The question remains whether, and to what extent, a punitive damage award can be expected to stimulate needed changes that have not and would not otherwise occur. It stands to reason that a large award, combined with its attendant adverse publicity, would get the attention of MBTA management at high enough levels to influence decision making. It is equally apparent, however, that an excessive award would be counterproductive, in that absent appropriation to fund its satisfaction, such an award would produce resource shortages likely to cause deficiencies in this or other areas of the MBTA’s operations.
Justice Breyer’s last two considerations offer no assistance here. No criminal sanctions have or could be imposed for the conduct in issue, and no evidence indicates whether any other civil actions of relevance have been filed against the MBTA.
Consideration of all the Labonte factors, including those derived from Justice Breyer’s concurrence in BMW v. Gore, leaves no room for doubt that the jury’s award of punitive damages in this case is excessive. A proper punitive damage award in this case would be an amount sufficient to convey a strong message to MBTA management, both of condemnation and of warning for the future, without impairing operations or imposing a hardship on passengers or taxpayers. It is this Court’s view that a punitive damage award of one million dollars would reflect a proper balance of the pertinent interests and considerations. Accordingly, the Court will order a new trial limited to the issue of the amount of punitive damages, unless the plaintiff serves and files notice in writing, within thirty days, that she will accept a punitive damage award in the amount of one million dollars.
III. Defendant’s Motion to Alter the Judgment.
In this motion, the defendant seeks to correct the judgment to strike the award of pre-and post-judgment interest on the punitive damage award, and to reduce the jury’s award of one dollar in compensatory damages based on the jury’s finding of thirty percent comparative negligence. After consideration of the issues raised by this motion, the Court concludes that the judgment must be corrected to exclude pre-judgment interest on punitive damages.[13]
Case law has established that pre-judgment interest under c. 231, §6B, does not apply to punitive damages. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 717 n.9 (1990); Nardone v. Patrick Motor Sales, Inc., 46 Mass.App.Ct. 452, 454 (1999). The plaintiff points out, however, that interest in wrongful death cases is governed not by c. 231, §6B, but by G.L.c. 229, §11. The observation is correct, but does not address the reasoning underlying the Courts’ construction of c. 231, §6B in those cases. Pre-judg *627 ment interest on compensatory damage awards serves to compensate a plaintiff for the loss of use of money that is, in turn, awarded to compensate for harm suffered. See Mirageas v. Massachusetts Bay Transportation Authority, 391 Mass. 815, 821 (1984). Punitive damages under the wrongful death statute, just like the punitive damages in issue in the cited cases, do not compensate, but instead punish. A plaintiff who recovers a punitive damage award has suffered no compensable loss by not having the money while awaiting judgment. Accordingly, the judgment must be corrected to eliminate pre-judgment interest.[14]
The defendant argues that the award of post-judgment interest should also be stricken, because no statute expressly authorizes the award of such interest against the MBTA.[15] For this contention the defendant relies on Judge Gants’ ruling on the same issue in Clifton v. MBTA, Suffolk Superior Court No. 95-2686H, 11 Mass. L. Rptr. 316 (February 3, 2000), at 25-26. In that decision Judge Gants considered a line of case holding that instrumentalities of the Commonwealth are not subject to interest absent express statutory authority, and reading statutes that subject such entities to liability to the same extent as private entities as not sufficiently express for this purpose. See Onofrio v. Department of Mental Health, 411 Mass. 657, 658 (1992) (construing Massachusetts Tort Claims Act as not authorizing interest against Commonwealth); City of Salem v. Massachusetts Commission Against Discrimination, 44 Mass.App.Ct. 627, 646 (1998) (construing G.L.c. 151B as not authorizing interest against municipality). Based on these decisions, Judge Gants concluded that although G.L.c. 161A, §21, on its face subjects the MBTA to the same liability that a private railway would have, is similarly lacking in the required express authorization. Acknowledging that Mirageas v. Massachusetts Bay Transportation Authority, 391 Mass. 815, 821 (1984), affirmed an award of interest on a tort judgment against the MBTA, Judge Gants noted that the authorization for such interest was not the issue raised in that case, and did not appear to have been presented or argued.
Judge Gants’ reasoning on this issue is certainly logical, and consistent with the case law cited. This Court, however, is not fully persuaded. The fundamental principle underlying those cases is that of sovereign immunity, which protects the Commonwealth and its instrumentalities from suit except insofar as authorized by statutory waiver, and requires narrow construction of such waivers. See Onofrio v. Department of Mental Health, 411 Mass. at 659, citing Ware v. Commonwealth, 409 Mass. 89, 91 (1991). The MBTAis an instrumentality of the Commonwealth. G.L.c. 161A, §2 (establishing MBTA as “a body politic and corporate and a political subdivision of the commonwealth”). The history of public authorities in Massachusetts, however, reveals that the legislature has chosen to treat them differently from both line agencies of the Commonwealth and municipalities. The statutes creating these entities have given them a degree of autonomy from the Commonwealth, both financial and managerial, with correspondingly separate and greater liability. See generally, Karlin v. Massachusetts Turnpike Authority, 399 Mass. 765, 767 (1987) (Turnpike Authority not entitled to sovereign immunity because of independent corporate existence); Okongwu v. Stephens, 396 Mass. 724, 730 (1986) (MBTA is not an “agency of the Commonwealth” for purposes of Mass.R.Civ.P. 4(a) because it “is an entity financially independent from the Commonwealth and has a separate corporate existence”); Kargman v. Boston Water & Sewer Commission, 18 Mass.App.Ct. 51, 54-55 (1984) (discussing history of concept of “body politic and corporate,” and hybrid nature of such entities). The most obvious example of this difference appears in comparison of the Massachusetts Tort Claims Act, G.L.c. 258, with the various statutes authorizing tort liability of public authorities; while the former caps liability at $ 100,000, precludes punitive damages and interest, and provides a number of special defenses, the latter generally have no such caps or express exclusions. Compare, e. g., G.L.c. 161A, §21 (MBTA liable "to the same extent as though it were a street railway company”); with G.L.c. 258, §2 (public employer “shall not be liable for interest prior to judgment or for punitive damages or for any amount in excess of one hundred thousand dollars”). See generally Magaw v. MBTA, 21 Mass.App.Ct. at 136-37 (discussing differences between c. 161 A, §21, and Tort Claims Act). This history leads this Court to conclude that the cases cited on this issue in Clifton do not apply to a public authority such as the MBTA, and that c. 161 A, §21, is properly read as authorizing liability to the full extent that would apply to a private entity, including post-judgment interest.
As to reduction of the one dollar award, the Court construes this aspect of the verdict as an award of nominal damages, reflecting the jury’s determination, based on its evaluation of the credibility of the evidence presented, that the decedent’s next of kin had suffered no compensable loss. Accordingly, although reduction of a compensatory award would ordinarily be required based on the finding of comparative negligence, and such reduction has been performed with respect to the award for conscious pain and suffering,[16] the Court concludes that no such reduction is warranted as to the one dollar award for wrongful death.
CONCLUSION AND ORDER
For the reasons stated, the hereby ORDERS as follows: The Plaintiffs Motion to Dismiss Defendant’s Post Trial Motions is DENIED. The Plaintiffs Motion to Strike the Defendant’s Motion for JNOV and Motion for New Trial for Bad Faith Representation of the Facts is DENIED. The Defendant’s Motion for Judgment Notwithstanding the Verdict is DENIED. The Defendant’s Motion for a New Trial is DENIED as to all issues of liability, and as to the amount of compensatory damages. The Defendant’s Motion for a New Trial shall be ALLOWED with respect to the amount of punitive damages unless, within thirty *628 days of this date, the plaintiff serves and flies notice that she will accept punitive damages in the amount of one million dollars, in which event the judgment shall be vacated as to punitive damages and judgment shall enter in that amount. The Defendant’s Motion to Alter the Judgment is ALLOWED insofar as it seeks to strike the award of pre-judgment interest on punitive damages, and is in all other respects DENIED.

Plaintiff has moved to “dismiss” the defendant’s post-trial motions for failure to comply with Superior Court Rule 9A, and to strike the motions for alleged “bad faith misrepresentation of the facts.” These motions must be denied. Assuming that Rule 9A applies to post-judgment motions subject to the ten-day limitation in Mass.R.Civ.P. 59(b) and (e), its purposes have been fully met here, as the plaintiff had well over ten days to respond to the motions before the Court considered them, and before the hearing on October 31, 2000, and then was permitted to submit a supplemental memorandum and supporting materials after the hearing. As to alleged “bad faith misrepresentation of facts,” the factual issues raised by the defendant’s post-trial motions are addressed in the body of this memorandum. One point requires comment: In a footnote to the Motion to Strike, plaintiff asserts that the defendant “Judicially admitted" a certain fact through its counsel's phrasing of a question to a witness at trial. As courts routinely instruct juries, a question to a witness is never evidence: only the answers are evidence. Still less could a question to a witness ever be a judicial admission, even if, as was not the case, it had been phrased as an independent affirmative statement rather than a reference to the witness’s testimony on a disputed issue of fact.

The evidence indicated that on two past occasions, both in about 1970, pedestrians had become stuck under green line trolley cars of a type different from that involved in this case. Captain Babcock testified that, on one of those occasions, the pedestrian was successfully extricated through the use of manual jacks. The evidence did not indicate whether or when any other such incidents have occurred.

The verdict form posed a single question to the jury on liability for punitive damages as to each of the plaintiffs two theories, without calling upon the jury to distinguish between wilful, wanton or reckless conduct and gross negligence. Neither side objected to the issue being posed in this manner.

The jury could have found, from the evidence, that a factor in causing part of the delay was the MBTA's staffing policy, under which the Reservoir Station car house, where the emergency vehicle was kept, could be left without staff ready to respond to emergencies for the last forty minutes of each shift, because staff were permitted to spend ten minutes washing and changing clothing, and to leave thirty minutes early as compensation for a meal break not taken earlier in the shift. The evidence did not indicate what, if any, relationship might exist between that policy and any collective bargaining agreement, nor did the evidence identify any financial implications of that policy.

Plaintiff placed much emphasis at trial on evidence that at the time of the accident two supervisory level personnel were on-call rather than in the district. In the Court’s view, this was a red herring. The evidence established that green line acting superintendent Paul Losi was at his brother’s home in Milton, having worked a full day, and was assigned to be on-call rather than physically present at any MBTA location. Nothing in the evidence would support a finding that his location was in violation of any policy, or that a standard of reasonable care would require the MBTA to have a superintendent physically present at all times, including after 11:00 p.m. on Christmas eve. As to supervisor Ruth Gray, the evidence established that she went home early, assuming an on-call status, with the permission of Losi as her superior, pursuant to a policy that allowed him to grant such permission on holidays. Nothing in the evidence would support a finding that that policy or its application was unreasonable in the circumstances, or that her presence on the scene would have made any difference in the effectiveness of the rescue effort.

The plaintiff never suggested that the gurgling sound reported by firefighter Gregorio indicated consciousness at that time, and the small size of the jury’s award on this claim precludes any theory that the jury relied on this aspect of the evidence to conclude that the decedent remained conscious up to the time this sound was heard.

The Court made clear in Bain v. City of Springfield, 424 Mass. 758, 768 (1997), that the obligation to review punitive damage awards for excess applies even where, as here, a defendant lacks the protections of due process because of its status as a governmental entity.

In the case of an entity of this type, the management of which is ultimately the responsibility of persons who owe their appointment to elected officials, it seems more likely that adverse publicity, rather than money, would effect punishment so as to motivate change. That has already occurred, in connection with the jury’s verdict, and will surely occur again as this case proceeds to its ultimate conclusion. Actual enforcement of this judgment would add little in that regard.

In support of their post-trial filings the parties have submitted various materials regarding the MBTA's funding mechanisms and recent legislative changes in those mechanisms, as well as news media reports regarding various controversies in connection with the MBTA’s finances and management. Each side has raised procedural objections to the other’s post-trial submission of these materials. Having reviewed the materials submitted, the Court sees no need to rule on the objections raised, as these materials have had no impact on the Court’s views as to the propriety of the damage award, or the maximum amount of punitive damages that would be warranted. Nothing in these materials alters the clear and undisputed fact that the MBTA’s ultimate funding source is necessarily and inevitably the taxpayers.

The defendant’s memorandum suggests, without explicitly so arguing, that it should be held, immune from punitive damages. The defendant made no such argument at trial or before. To the contrary, in response to the Court’s specific inquiry at a pre-trial hearing as to whether the law clearly subjects the MBTA to punitive damages, all counsel agreed that it does. When the time came to present the issue of punitive damages to the jury, the defendant raised various grounds of objection, but immunity was not among them. Accordingly, the Court does not now consider this suggestion.

 Plaintiffs counsel has submitted an affidavit asserting that prosecution of this action has cost a total of $677,728.83 in attorney time and expenses, including more than fifty hours per week of the time of each of four attorneys throughout a period of eight weeks up to and including trial. The Court is skeptical of these figures, but has no occasion to conduct the kind of inquiry that would be necessary to determine the actual amount of attorney time and expenses reasonably incurred in this case.

The Affidavit of Attorney Hope, summarizing settlements and jury verdicts in wrongful death cases as reported in Massachusetts Lawyer’s Weekly, to the extent that such reports can be viewed as a fair reflection of amounts recovered on meritorious claims, confirms this impression.

The plaintiff argues that the defendant waived any objection to interest by requesting a jury instruction, in standard form, to the effect that the jury should not add anything to its damage award on account of the passage of time pending judgment, because the clerk would automatically add interest as provided by statute. The partial transcript provided to the Court by the plaintiffs counsel in *629 connection with the post-judgment motions reveals that that instruction was not given in the punitive damages phase. Even if it had been, it would have been correct, and no waiver would result from the defendant’s having requested it. Interest is not a proper consideration for a jury in determining damages, whether compensatory or punitive; rather, interest is governed by statute. Where the law allows interest, the clerk adds it, and the jury properly does not; similarly, where the law does not allow interest, neither the clerk nor the jury can properly add it, and an instruction to the jury not to do so is entirely proper.

The plaintiff suggests that at the time of enactment of c. 229, g 11, all damages allowed in wrongful death cases were punitive in nature, so that c. 229, 811, must have been intended to provide for pre-judgment interest on punitive damages, otherwise it would have been a nullity. However, the history is less clear than the plaintiffs argument acknowledges. Compare Mone v. Greyhound Lines, 368 Mass. 354, 360 (1975) (referring to “the punitive death statute applicable to the facts of this case, or . . . the recently amended compensatory statute”), with Gaudette v. Webb, 362 Mass. 60, 66, n. 4 (discussing histoiy of wrongful death statute, including 1947 enactment providing for recovery on “a compensatory basis," followed by 1949 enactment under which “the punitive approach was reinstated”).

This argument would apply to the award of compensatory as well as punitive damages, although the defendant presents it in reference to the punitive damages.

The plaintiff argues to the contrary, citing Zeroulias v. Hamilton American Legion Association, 46 Mass.App.Ct. 912, 912 (1999). That decision held, in answer to a reported question arising from a liquor licensee’s alleged service of an intoxicated person, that the comparative negligence statute “does not apply to intentional or wilful, wanton, or reckless conduct,” as alleged under the liquor liability statute, G. L. c. 231, §85T. That decision has no application to the compensatory damage aspects of the verdict in this case, which arise from the jury’s finding of ordinary negligence.